527 S.E.2d 371

**John A. KIRIAKIDES and Louise Kiriakides, Respondents,**

v.

**ATLAS FOOD SYSTEMS & SERVICES, INC., Marica Enterprises, Ltd., Marica, Inc., and Alex Kiriakides, Jr., Appellants.**

No. 3107.

Court of Appeals of South Carolina.

Heard Jan. 13, 2000.

Decided Jan. 31, 2000.

Rehearing Denied April 1, 2000.

---

F. Barron Grier, III, and Deborah H. Sheffield, both of Grier Law Firm, of Columbia; and Ellis M. Johnston, II, Haynsworth, Marion, McKay & Guerard, of Greenville, for appellants.

Wilburn Brewer, Thomas L. Stephenson and Charles W. Emory, Jr., all of Nexsen, Pruet, Jacobs & Pollard, of Columbia; George J. Conits, of Greenville, for respondents.

ANDERSON, Judge:

Atlas Corporation and Alex Kiriakides appeal a circuit court order finding Alex defrauded his brother and sister, John and Louise Kiriakides, and Atlas must provide an accounting and buy out John and Louise's minority Atlas shares. We affirm and remand.

## FACTS/PROCEDURAL BACKGROUND

Alex Sr. and Marica Kiriakides immigrated to this country from Turkey in the early twentieth century. They had five children: Alex, Louise, John, Libby, and George. Alex is the oldest. George passed away in 1968.

At the time of trial, John was approximately 69 years old, while Alex was 85 or 86. Both John and Alex have worked all of their lives in Atlas and the other various family businesses. In many ways Atlas is the family, and the family is Atlas. Alex and his father started a wine business in the thirties. John helped by sealing the bottles and washing returned bottles. The wine company eventually went bankrupt and Alex entered the service.

While Alex was gone, John and his father sold fireworks and maintained the few cigarette vending machines they could supply. When Alex returned, John and his father had managed to save $20,000 from their various business ventures. All three brothers and their father went into business together.

In 1949, Alex Sr. passed away. Alex was 35 or 36 years old. John was 21 years old. Alex assumed the role of the head of the family. All five children were still living at home with their mother at that time. The family expanded its fireworks business and operated cigarette and candy vending machines. In 1953, John was drafted to serve in the Korean War. Alex got married in 1955.

Alex handled the business' financial matters. Louise counted money collected from the machines. John handled the routes. This division of labor continued throughout most of

their working lives. Eventually, the siblings decided to incorporate the business in 1957, and it became known as Atlas Vending Co. Incorporated. Alex, George, and John were elected as directors. Atlas is a contract food service that provides refreshments to factories and other businesses.

After incorporation, Alex kept the checkbook and dealt with the banks, lawyers, and accountants. The vending machine business later expanded into food, pastries, coffee, and cold drinks. Alex continued to be responsible for all financial matters while John handled operations.

The family's business and personal lives were completely interwoven. For example, at tax time, under Alex's directions, corporate employees would prepare personal tax returns for Alex, John, and Louise. Corporation money was liberally loaned to family members for personal items without provisions for repayment.

Over the years, Atlas spun off various other business entities. Atlas Corporation funded Marica, Inc. (Marica) to hold real estate and to invest in real estate. This corporation was viewed as a way to overcome retained earnings. K Enterprises, a partnership, was formed to handle investments. Marica Enterprises, Ltd. (MEL) is also a partnership. MEL is Atlas' landlord. Alex decided when and how each new business entity such as Marica would be created.

In 1986, John became president of Atlas and continued to primarily handle the company's day to day operations. John married again shortly before trial and has had no children. Alex has four children: Alex III, Mary Ann, Michael, and Cathryn. Alex III, Michael, and Mary Ann began working for Atlas.[1] After George passed away, John and Louise provided a home for George's three children.

In 1995, a rift developed between John and Alex over a real estate transaction unrelated to Atlas. John discovered Alex had caused him to convey his entire interest in property in Greenville to Alex III, and for a price less than the value of

---

[1]. Alex III worked as Vice President of Sales and Client relations, Michael was Vice President of Vending Operations, and Mary Ann worked as the Executive Accounting Coordinator. As of October of 1997, Michael has been employed in real estate and no longer works for Atlas.

the property. The brothers' relationship became very strained and the environment at Atlas was tense.

Several events involving Atlas occurred to add to the problems between Alex and John. The Board of Atlas decided to change the company's status to an S Corporation from an C Corporation. John was in favor of this change. However, Alex, as majority shareholder, overruled the decision and Atlas remained a C Corporation. The next incident took place in 1996, when John learned Alex had made decisions contrary to the majority and without informing John. Atlas agreed to purchase a piece of property in Columbia. However, John, Alex III, and Bill Freitag determined it would not be in Atlas's best interest to purchase the property. Alex told Alex III to continue with the purchase. John found out the following day while riding with Alex III to Columbia on unrelated business.

There is a dispute over whether John said he quit when he found out about Alex overturning the purchase decision, or whether he just got out of the car upset. The next morning, John went to work as usual. He met with Freitag, then left to meet with Atlas offices in Columbia, Orangeburg, and Charleston. On Monday, John had breakfast with Alex III and Michael, and they discussed work related matters. John found out through Michael that Alex no longer intended John to be president of Atlas. John circulated a memo stating he intended to remain at Atlas and to continue as president. Alex III responded by memo, explaining John would no longer serve as president of the company. John was subsequently offered a position as a consultant, but refused.

John filed the original complaint in order to obtain records from Atlas and for an accounting of partnership affairs. The complaint was amended seeking a judicial dissolution, an accounting, and damages for fraud. By agreement of the parties, the trial was bifurcated pursuant to Rule 42(b). The bipartite trial activity resulted in a liability proceeding with the damages aspect saved for later consideration. The liability hearing took place on August 24–27 and September 1, 1998. After the initial order on October 12, Atlas and Alex moved for reconsideration under Rules 52(b) and 59(e), SCRCP on Octo-

ber 22, 1998. The Special Referee[2], Frank S. Holleman III issued a second order on November 6, 1998.

## *ISSUES*

I. Did the Special Referee err in finding Alex committed fraud in the transfer of 21 percent of Marica, Inc.?

II. Did the Special Referee err in finding Alex committed fraud in regards to the distribution of profits and the number of shares owned by Louise?

III. Did the Special Referee err in ordering a forced buyout of John and Louise?

IV. Did the Special Referee err in denying Atlas's counterclaim for the negative balance in John's capital account in Marica Enterprises, Ltd?

## *STANDARD OF REVIEW*

This case consists of actions in law and equity. "When legal and equitable actions are maintained in one suit, each retains its own identity as legal or equitable for purposes of the applicable standard of review on appeal." *Corley v. Ott,* 326 S.C. 89, 485 S.E.2d 97, n. 1 (1997) (citing *Future Group v. Nationsbank,* 324 S.C. 89, 478 S.E.2d 45 (1996)).

### I. Fraud

"Actionable fraud is an action at law unless an equitable remedy is sought." *Perry v. Heirs at Law and Distributees of Charles Gadsden,* 313 S.C. 296, 301, 437 S.E.2d 174, 178 (Ct.App.1993). John and Louise seek actual and punitive damages for fraud. Actual and punitive damages are not an equitable remedy. *Id.* Hence, the trial judge's findings regarding fraud will not be disturbed on appeal if there is any evidence in the record supporting it. *Townes Associates, Ltd. v. City of Greenville,* 266 S.C. 81, 221 S.E.2d 773 (1976).

In an action at law, on appeal of a case tried without a jury, the findings of fact of the judge will not be disturbed upon appeal unless found to be without evidence which reason-

---

**2.** The Honorable John W. Kittredge referred the case to Holleman and Holleman was empowered to enter a final order with appeal directly to the South Carolina Supreme Court.

ably supports the judge's findings. The rule is the same whether the judge's findings are made with or without a reference. The judge's findings are equivalent to a jury's findings in a law action.

*Townes Associates, Ltd. v. City of Greenville,* 266 S.C. 81, 86, 221 S.E.2d 773, 775 (1976) (citing *Chapman v. Allstate Ins. Co.,* 263 S.C. 565, 211 S.E.2d 876 (1975)).

## II. Corporate Buyout

A corporate dissolution, under S.C.Code Ann. § 33–14–300 *et seq.,* is an equitable relief. *Ward v. Ward Farms, Inc.,* 283 S.C. 568, 324 S.E.2d 63 (1984). The provisions of S.C.Code Ann. § 33–14–310(d), allowing for appropriate alternative relief including a buyout of shareholders by other shareholders or the corporation, are also equitable. *McDuffie v. O'Neal,* 324 S.C. 297, 476 S.E.2d 702 (Ct.App.1996); *See Hite v. Thomas & Howard Co. of Florence,* 305 S.C. 358, 409 S.E.2d 340 (1991), *overruled on other grounds by Huntley v. Young,* 319 S.C. 559, 462 S.E.2d 860 (1995) (characterizing as equitable the relief provided by S.C.Code Ann. § 33–14–310(d)).

In an action in equity, tried by the judge alone, without a reference, on appeal the Supreme Court has jurisdiction to find facts in accordance with its views of the preponderance of the evidence.

*Townes,* 266 S.C. at 86, 221 S.E.2d at 775 (citing *Crowder v. Crowder,* 246 S.C. 299, 143 S.E.2d 580 (1965)). *Accord Segall .v. Shore,* 269 S.C. 31, 236 S.E.2d 316 (1977).

### *LAW/ANALYSIS*

On appeal Alex and Atlas contend the trial court erred in: 1) finding Alex liable for fraud in connection with the 21 percent interest in Marica; 2) finding Alex liable for fraud in connection with Louise's stock ownership and the 1990 distribution of profits to Louise; 3) finding a buyout of John and Louise's shares was justified by the evidence; and 4) denying Atlas's counterclaim for the negative balance in John's MEL capital account.

## I. The Divestment of Marica Interest By Atlas

Alex maintains the Referee erred in finding him liable for fraud in the transfer of 21 percent interest in Marica stock. Alex bases this contention on three grounds: 1) John and Louise do not have standing to raise the issue of fraud because Marica, Inc. was an Atlas corporate asset; 2) the trial court did not have jurisdiction to find the 21 percent interest belongs to K Enterprises rather than to Alex III and Michael; and 3) there was no clear, cogent, and convincing evidence Alex acted fraudulently.

In 1986, as a result of a switch to corporate subchapter S status, Atlas was required to divest itself of twenty-one percent of its holdings in Marica, Inc. Alex claims the Marica shares were purportedly transferred to his sons, Alex III and Michael, rather than to the partnership K Enterprises. John and Louise argued if the shares are the property of Alex III and Michael, this was done without their knowledge, and constituted a fraudulent breach of Alex's fiduciary duty to them. The Special Referee found although the shares were ostensibly transferred to K Enterprises, uncompleted documents indicate Alex intended to transfer the shares to his sons, and may have attributed income or other benefits arising from the shares to his sons instead of to K Enterprises.

The trial court concluded the tax laws required Atlas to divest itself of 21 percent of Marica in 1986. The court found the following facts: 1) these shares were not transferred to Alex III and Michael; 2) the shares were transferred to K Enterprises; 3) K Enterprises owns this 21 percent interest; 4) despite the transfer to K Enterprises, the evidence showed Alex decided to treat the Marica shares as being owned by Alex III and Michael; 5) if this deprived John and Louise, as partners in K Enterprises, of any money or property, Alex's actions would constitute fraud; and 6) John and Louise are entitled to recover from Alex any damages they suffered as a result of Alex's attribution of the stock to his sons.

In the November 6, 1998 order, the court ruled K Enterprises, Alex III, and Michael were not necessary parties. In doing so, the court noted Alex III had been a party in the present action but moved to be dismissed. The order annunciated:

It has yet to be determined whether the plaintiffs are entitled to recover for fraud with respect to the transfer of the Marica stock once owned by Atlas; the amount due Louise under the fraud claim has not been determined; the plaintiff's stock has not been valued under the buy out (sic) claim; and the exact amounts owed by John under the counterclaims have not yet been determined. For these reasons, under the South Carolina Rules of Civil Procedure, a Rule 59(e) motion to alter or amend the judgment is not now appropriate for decision.

The court, in the November Order, did not address Atlas's claims: 1) K Enterprises did not have the legal ability to own the Marica stock; 2) John and Louise do not have standing to bring their fraud claim; 3) Alex had authority to make the Marica transfer and John and Louise had no expectation as to where the stock would be transferred; 4) there is no evidence K Enterprises paid any consideration for the Marica stock whereas Alex III and Michael did; and 5) the tax returns for K Enterprises do not reflect a transfer of Marica stock to it.

In considering these claims, the trial court held the above points would not be addressed at the present time noting:

The October 12 Order did not make a final determination as to whether the plaintiffs were entitled to recover for fraud as to the transfer of Atlas' Marica stock. See Conclusions of Law 58–59. The October 12 Order instead provided for an accounting, whereby the defendants will account for what, if any payments were made on the note on behalf of Alex III and Michael for the Marica stock. The defendant's motion as to the transfer of the Marica stock should be addressed after that accounting has been provided and the record contains additional evidence concerning the Marica stock transferred by Atlas.

Because the court determined "liability" issues, the October 12 Order can be reviewed under Rules 52(b) and 54(b), SCRCP. This bifurcated trial under Rule 42(b), presents the unusual judicial scenario of consideration of liability only. On remand, the trial court will amalgamate the appellate conclusions in regard to the rulings on liability with a final decision on damages.

## A. Standing

■ We find John and Louise did have standing to raise the issue of fraud. The Special Referee ruled the 21 percent interest was transferred to K Enterprises. Because John and Louise are partners in K Enterprises, we find they do have standing to raise the issue of fraud in the handling of these shares. John and Louise do not contend *Atlas* suffered an injury because of the transfer. The transfer of the stock from Atlas was compelled by tax laws. In contrast, if the stock, although ostensibly transferred to K Enterprises, was not attributed to it, John and Louise may have been deprived of benefits of their partnership interest in K Enterprises. *All* benefits of the 21 percent interest should have accrued to K Enterprises, not to Alex III and Michael.

Appellants rely on *Todd v. Zaldo,* 304 S.C. 275, 403 S.E.2d 666 (Ct.App.1991), for the proposition an individual stockholder may not bring an action for loss to a corporation. The entity suffering a possible loss was K Enterprises, a partnership. *Todd* is therefore inapplicable to the facts of the instant case.

Appellants assert the trial court granted a relief not prayed for when it held K Enterprises owned 21 percent of Marica. At trial, counsel for Appellants argued:

The second fraud issue, alleged fraud, has to do with Marica, Inc. to Atlas, not John or Louise Kiriakides, but Atlas, to some other entity or person. There is testimony in documents that indicate that the 21% was transferred to K Enterprises. If the Court finds that, then he has no complaint as far as fraud is concerned there because that's where he says that he thought that it was going to. Even though he really didn't have any knowledge, he just said that's what the documents say, and that's where it ought to be. He didn't even know about it before the suit. The second piece of evidence or destination where 21% of Marica may have gone is to Michael Kiriakides and Alex Kiriakides, III. The testimony, in the Plaintiff's case, is that there was consideration paid that's been booked on the records of Atlas; it is payable to Atlas from Michael and to Alex Kiriakides, III. So we are sort of left with one of two ways. Either Michael and Alex, III, pay consideration, which they

do not disagree that it's valid or invalid, or is over in K Enterprises. *If the Court wants to decide where it is, that's an issue that I think is—even though not necessarily brought up by the pleadings, is certainly an issue that the Court can consider and make that determination.*

(Emphasis added.) Having placed the issue of the ownership of the 21 percent interest in Marica before the lower court, Appellant may not now argue on appeal that the court in deciding that very issue "grant[ed] relief that was not prayed for." *See Shearer v. DeShon,* 240 S.C. 472, 484, 126 S.E.2d 514, 520 (1962) (holding a party may not complain of error his own conduct has induced).

## B. Fraudulent Transfer of 21 Percent Interest in Marica

The Special Referee ruled:

135. Based on this evidence, the 21% interest in Marica is owned by K Enterprises, not Michael and Alex III. This finding is supported by the following facts. (a) It is undisputed that Atlas was required to transfer 21% of Marica. (b) The only executed document effecting that transfer is the document transferring Atlas's 21% interest to K Enterprises. That transfer is logical, because the ownership interests of Alex, John, and Louise in K Enterprises are similar, though not identical, to their interests in Atlas itself. (c) No document was executed by Atlas or K Enterprises to transfer any ownership interest in Marica to Alex III or Michael. (d) The document that was drafted to make the transfer to Michael and Alex III was not executed. (e) Michael never made any payments under the note that was signed in connection with the claimed transfer to him, and Michael was unaware of the note.

136. Further, Alex or persons acting at his direction caused the attribution of the ownership of the Marica stock to Michael and Alex III, and Alex did not disclose that attribution to John and Louise. This finding is supported by the following evidence. (a) Alex controlled the financial affairs of Atlas and its related entities and took actions often without the knowledge of John or Louise. (b) According to Mr. Freitag, the note from Michael and Alex III was carried on Atlas's books; that decision, according to the practice of Alex and Atlas, would have been made by Alex or persons

acting at his direction. (c) This action is consistent with Alex's plans to move ownership interests in Atlas and related entities to his children. (d) The unexecuted document that would have transferred that Marica stock to Michael and Alex III was drafted by or at the direction of Alex or persons acting at his direction. (e) The testimony of John and Louise that they did not know of the transfer to Michael or Alex is credible.

Appellants contend the evidence did not support a finding 21 percent of Marica was transferred to K Enterprises. We disagree. The action for fraud is one in law. Hence, the trial judge's findings regarding fraud will not be disturbed on appeal if there is any evidence in the record supporting it. *Townes Associates, Ltd. v. City of Greenville,* 266 S.C. 81, 221 S.E.2d 773 (1976).

To establish fraud, the following nine elements must be shown: 1) a representation or nondisclosure of a material fact, 2) its falsity, 3) its materiality, 4) either knowledge of its falsity or a reckless disregard of its truth or falsity, 5) intent that the representation be acted upon, 6) the hearer's ignorance of its falsity, 7) the hearer's reliance on its truth, 8) the hearer's right to rely thereon, and 9) the hearer's consequent and proximate injury. *See Manning v. Dial,* 271 S.C. 79, 245 S.E.2d 120 (1978); *Lawson v. Citizens and Southern National Bank of South Carolina,* 259 S.C. 477, 193 S.E.2d 124 (1972); *Jacobson v. Yaschik,* 249 S.C. 577, 155 S.E.2d 601 (1967); *Hurst v. Sandy,* 329 S.C. 471, 482, 494 S.E.2d 847, 853 (Ct.App.1997). The "[f]ailure to prove any element of fraud is fatal to the action." *Sorin Equipment Co. v. The Firm,* 323 S.C. 359, 366, 474 S.E.2d 819, 823 (Ct.App.1996) (citing *King v. Oxford,* 282 S.C. 307, 318 S.E.2d 125 (Ct.App.1984)).

The judge's finding of fact that 21 percent of Marica was transferred to K Enterprises is supported by the record. Atlas owns 79 percent of Marica. The remaining 21 percent is owned by K Enterprises. The shares were conveyed to K Enterprises on December 31, 1986. Bill Freitag, Senior Vice President of Finance and Administration at Atlas, explicated there was a signed document showing 21,000 shares of Marica were transferred to K Enterprises. In contrast to this document, the documents relating to a transfer of the Marica

interest from K Enterprises to Alex III and Michael are unexecuted. Michael verified he did not make any payments on the Marica note. According to Freitag, the note to Marica was carried on Atlas's books, instead of Marica's.

Appellants aver the partnership agreement prohibits K Enterprises from holding stock in Marica. In support of this argument they point to section 2.0 of Article II of the partnership agreement, which provides the purpose of the partnership is: "[t]o invest in the trading of exempt government securities and obligations guaranteed by the United States government." However, Appellants' argument disregards the very next section of the agreement, which states: the partnership may "undertake any additional activities or investments as decided by a majority in interest, not in number, of the Partners" subject to Article X. Article X merely provides the procedure by which the Managing Partner shall give notice to the partners of a proposed new investment. Therefore, nothing in the partnership agreement prohibits K Enterprises from purchasing Marica stock.

Additionally, Appellants maintain there is no clear, cogent and convincing evidence Alex acted fraudulently with respect to the transfer of Marica stock.

The nondisclosure of [a] fact becomes fraudulent because it was the duty of the defendant, having knowledge of the facts, to disclose such to the plaintiff. We have held that nondisclosure becomes fraudulent when it is the duty of the party having knowledge of the facts to uncover them to the other. The duty to disclose may be reduced to three distinct classes: (1) where it arises from a preexisting definite fiduciary relation between the parties; (2) where one party expressly reposes a trust and confidence in the other with reference to the particular transaction in question, or else from the circumstances of the case, the nature of their dealings, or their position towards each other, such a trust and confidence in the particular case is necessarily implied; (3) where the very contract or transaction itself, in its essential nature, is intrinsically fiduciary and necessarily calls for perfect good faith and full disclosure without regard to any particular intention of the parties. *Warr v. Carolina Power & Light Co.*, 237 S.C. 121, 115 S.E.2d 799;

*Gordon v. Fidelity & Casualty Co.,* 238 S.C. 438, 120 S.E.2d 509.

*Jacobson v. Yaschik,* 249 S.C. 577, 585, 155 S.E.2d 601, 605 (1967).

Alex had a fiduciary duty to John and Louise as both the managing partner of K Enterprises and a trusted family member. In *Meinhard v. Salmon,* 249 N.Y. 458, 164 N.E. 545 (1928), Chief Judge Cardozo of the New York Court of Appeals described the duty of partners as follows: partners "owe to one another, while the enterprise continues, the duty of the finest loyalty. Many forms of conduct permissible in a workaday world for those acting at arm's length, are forbidden to those bound by fiduciary ties.... Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior." *Id.* at 515–516, 548.

Alex directed and handled all of the financial affairs of Atlas and the other business entities. The record shows John and Louise[3] trusted Alex to properly transfer the 21 percent interest in Marica from Atlas to K Enterprises and to insure K Enterprises reaped the benefit of that transfer.

We cannot, as Appellants would have us do, weigh the evidence to determine if it is clear, cogent, and convincing. *See Burns v. Wannamaker,* 286 S.C. 336, 333 S.E.2d 358 (Ct.App.1985) (holding in an action for fraud, where the proof must be by clear, cogent, and convincing evidence, our scope of review is limited to determining whether there is any evidence reasonably supporting the circuit court's findings). Giving efficacy to our standard of review, we place our imprimatur upon the conclusion of the court:

Under the fraud claim, the plaintiffs are entitled to recover from the defendant Alex Kiriakides, Jr., any damages they have suffered as a result of him causing that Marica stock to be attributed to Michael Kiriakides and Alex Kiriakides III[.]

---

**3.** Louise stated she trusted Alex and did what he told her to do. If he told her to sign something, she did. John testified: "Alex always dealt with the lawyers and the accountants and anything pertaining to that type thing. That was Alex's responsibility; I never drifted into his area, and he never drifted into mine."

## II. Louise's Stock Ownership and the 1990 Distribution

In 1990, Atlas made a distribution of profits to shareholders based on their proportionate ownership. Louise professed that Atlas and Alex, prior to this distribution, fraudulently deprived her of thirty shares and her 1990 distribution was incorrectly calculated on this reduced ownership.

Alex argues the trial court erred in finding him liable for fraud in connection with Louise's stock ownership and the 1990 distribution to Louise. The trial court held if this distribution was based on 271 shares rather than 301, Louise suffered damages.

### A. Louise's Stock Ownership

■■■■ The trial court found Louise owns 301 shares of Atlas stock. The November 6, 1998 order further stated Louise did not give away 30 shares of stock to Alex's children. This finding was partly based on the fact there was no document in evidence signed by Louise indicating a transfer of shares. The court's ruling is supported by evidence in the record.

A memo dated March 29, 1996, evidenced Louise owns 301 shares. Atlas contended Louise owns 271 shares rather than 301. This contradicts a letter Atlas gave to John in July of 1996, in which Atlas stated Louise owned 301 shares. The original stock book for Atlas cannot be located. Former IRS Investigator, Henry Harrison testified on behalf of John and Louise that as of January 1, 1989, Atlas paperwork showed Louise's shares declined by thirty shares while those of Alex III, Michael, and Mary Ann increased. Harrison did not locate any signed corporate documents reflecting a transfer.

An accounting worksheet from December 21, 1989, indicated proposed gifts by Alex to his children and by John and Louise to Alex's children. Additional memos and workpapers reflected another gift by John and Louise to Alex's children on December 31, 1990. The resulting stock ownership was shown as:

| | |
|---|---|
| Alex | 4,748 shares |
| John | 3,152 shares |
| Louise | 231 shares |
| Alex III | 156 shares |
| Michael | 114 shares |

Mary Ann                    59 shares

Mary Ann stated in her deposition she had no knowledge of these gifts. Alex III could not remember hearing either John or Louise tell anyone they gave away any of their shares.

Furthermore, Louise denied at trial that she knowingly gave away any of her stock to Alex's children. Louise testified she owned 301 shares. Similarly, Harrison found no evidence Louise gave shares to anyone. He located no estate planning documents indicating John and Louise planned to give stock to any of their other nieces and nephews, not even to George's children whom they had raised.

Alex admitted there was no documentation Louise's shares had been reduced. Alex agreed that in April of 1995, he informed John that Louise had 301 shares. When questioned why he told John that Louise had 301 shares if she only had 271, Alex answered:

> Tom, you're right 100 percent. I signed it; I didn't know about all this 30 shares. It all came up in John's, in his records, that he had gifted it. And you want to know the truth? I didn't know whether she gifted it or not. I'm responsible for those thirty shares because I don't have any records; as you have all these records, it's not in there, Tom.

The record demonstrated Alex directed all financial aspects of Atlas. According to Louise, "Alex took care of all of the business details, taxes and all the decisions and everything; Alex did all of that." Atlas handled and filed Louise's income tax returns. Louise trusted Alex and did what he told her to do. If he told her to sign something, she did.

### B. 1990 Distribution

With respect to the Atlas 1990 Distribution[4], the Special Referee held Louise's distribution was calculated on 271 shares when in fact she owned 301 shares. Additionally, by appropriating Louise's distribution, Alex violated his fiduciary duty to her and is liable for fraud.

---

4. John conceded he suffered no damages as a result of Alex's handling of the 1990 Atlas distribution because he later received his money with interest.

The lower court's holding is supported by the record. Harrison stated it was not clear whether Louise's distributions were calculated on the basis of 271 shares or 301 shares. After 1988, a distribution was made based on 271 shares.

Moreover, John testified Atlas held Louise's money in Marica Enterprises, Ltd., although Louise paid income taxes on the money. When questioned about Louise's $50,000 dividend resulting from the change back to a C corporation in 1990, Alex answered simply "I kept it." When asked why he did this, he replied: "Because all the time that I—what I done for her, I thought she owed me something for her taxes that I've been paying for her." Alex stated: "I told you the truth, Tom. I did not pay—I kept the money for the debt she owed me for millions—whatever I've done for her, I felt like I'm entitled to it. I needed the money more than she did." Thus, the evidence is more than sufficient to support the trial court's ruling on fraud as to Louise's shares and the distribution.

### III. Buyout of Minority Shareholders

The trial court found John and Louise were entitled to have Atlas buy out their minority shares. Alex argues John and Louise failed to prove oppression, illegality, fraud, or unfair prejudice entitling them to a buyout. We disagree.

The trial court's determination of fraudulent conduct with respect to Louise's shares and the transfer of the Marica interest to K Enterprises entitles John and Louise to a buyout on this basis alone. Further, we examine whether Alex, and others in control of Atlas, have acted in an oppressive or unfairly prejudicial manner to the corporation or to John or Louise.

The Referee's order concluded a buyout of John and Louise's shares in Atlas is appropriate relief. In reaching this decision, the court noted Alex has taken actions in the past to deprive both Louise and John of their interests in Atlas. It found without a buyout, Louise and John have no prospect of receiving any financial benefit from their ownership of shares in Atlas. (With the exception of John's retirement payments.) In contrast to John and Louise, Alex and his immediate family receive, and will continue to receive, substantial benefits from

their ownership in Atlas. Atlas has substantial cash, liquid assets, investments, and very little debt.

Alex and Alex III control Atlas's Board of Directors. Although in a position to declare dividends, Atlas has not paid dividends since 1990, and has no plans to do so in the foreseeable future. Atlas does not plan to make a public offering of its shares, and Alex's proposed one million dollar net buyout offer was extremely low.

The trial court concluded the above factors indicate Alex and a majority of the Atlas Directors:

'[H]ave acted, are acting, or will act in a manner that is illegal, fraudulent, oppressive, or unfairly prejudicial' to John and Louise, as provided in S.C.Code § 33–14–300. The treatment of Louise concerning her 1990 distribution and her 30 Atlas shares was fraudulent within the meaning of the statute, as was the handling of the 21% interest in Marica owned by Atlas and conveyed to K Enterprises. Those actions were oppressive and unfairly prejudicial toward Louise and John. The other factors, set forth above, show oppressive or unfairly prejudicial treatment of John and Louise in the past, at present, and in the future.

The record demonstrated that based on the original stock certificates, John believed he and Alex each owned approximately fifty percent of the corporation with Alex owning ten shares more than he (John) did.[5] To John's amazement, he discovered Alex later owned much more stock than he did. In 1995, Alex gave John a memo reflecting the following percentages of stock ownership in Atlas. Alex—4,906 shares; John—3,192 shares; Louise—301 shares; and Alex III—61 shares.

When asked at trial how it came to be that he had more shares of Atlas than anyone else, Alex stated: "Why shouldn't I? I own the damn company; I built it. I didn't own it at all, but I built the company. Why shouldn't I have all the shares?"

---

**5.** John testified: "[I]t looks from the stock certificates that our old certificates, the original certificates, were just about fifty/fifty except for ten shares, and then the merger became (sic) into North Carolina and Georgia and Atlas Enterprises, that Alex received considerably more shares than I did. I can't really give you an answer why."

According to Alex, when Atlas incorporated, twenty-five percent of the shares were given to George, fifty percent for himself, and twenty-five percent for John. When George died, Alex explained he got half of George's shares and John got half. Alex said he gave away his ten percent to the family. However, on cross-examination, Alex conceded he had to go along with records showing John originally had 2360 shares and he had 2370 shares. Alex professed ownership of Atlas Vending of N.C. was split fifty/fifty, but it was not his idea to do so.

John stated he was not aware he gave twenty thousand dollars worth of Marica, Ltd. stock to Michael and Alex III. John explicated he intended to give them each $10,000 cash, but this somehow was reflected as a $10,000 gift of stock on his tax returns. Alex had encouraged John to give his stock to his kids. This prompted John to further investigate, and he discovered Alex and Michael apparently owned 21 percent of Marica, Inc. Mary Ann testified John never gave twenty shares of Atlas stock to Michael and Alex III although she told the accountants these gifts had been made.

In 1986, Atlas became an S Corporation. In 1990, Atlas was changed to a C Corporation. In 1996, Atlas' shareholders decided to return to corporate S status but Alex overruled the decision and Atlas remained a C corporation. This unilateral decision by Alex created further friction between Alex and John. John asked Alex for the stock book. Alex provided it. John copied the book and returned it. The book has since disappeared and was not introduced at trial. John's copies of the book were introduced. John also requested financial information from Alex. Alex failed to provide this information. The brothers' relationship became "very very strained." According to John, Alex refused to buy him out, provide him with information, or do anything.

This case is a textbook example of oppression in a close corporation,[6] particularly with respect to John, and graphically illustrates the necessity for statutes such as S.C.Code Ann. § 33–14–300 (1990) protecting minority shareholders.

---

6. Although the record does not establish whether Atlas applied for South Carolina statutory close corporation status, Atlas is nonetheless an archetypal example of a close corporation.

## A. Nature of Close Corporations

The nature of close corporations is unique. In *Special Characteristics, Problems, and Needs of the Close Corporation*, 1969 U.Ill.L.F. 1 (1969), Professor Hetherington explained:

> The right of the majority to control the enterprise achieves a meaning and has an impact in close corporations that it has in no other major form of business organization under our law. Only in the close corporation does the power to manage carry with it the de facto power to allocate the benefits of ownership arbitrarily among the shareholders and to discriminate against a minority whose investment is imprisoned in the enterprise.

*Meiselman v. Meiselman*, 309 N.C. 279, 307 S.E.2d 551, 559 (1983) (quoting Professor Hetherington, *supra*, at 21).

If personal relationships between shareholders in a close corporation sour, minority shareholders like John and Louise are particularly vulnerable, and have limited means at their disposal of receiving a return on their stock.

> Within a closely held enterprise, a more intimate and intense relationship exists between capital and labor. There is no market for the corporation's shares and no separation of function between those who provide the capital and those who manage the enterprise. The enterprise is not only a vehicle for investment of the participants money capital, but also provides regular employment for investment of their human capital. Shareholders in a close corporation usually expect employment and a meaningful role in management, as well as a return on the money paid for the shares. Further, their expectations often are complicated by family or other personal relationships within the corporation.
>
> . . . .
>
> When harmony between participants disappears, a minority participant may find that the majority interests can manage the affairs of the corporation in unexpected ways. Those in control of the board can terminate minority shareholders' employment as officers, thereby diminishing the return on their investments. The corporation may not pay dividends to any shareholders to avoid double taxation, yet the majority shareholders will continue to receive a return on their

investment in the form of salary or perhaps rent or interest on money loaned to the corporation. Indeed these amounts may increase after the minority shareholder is excluded. Traditionally, the minority shareholder has had no way to protect himself or herself against such an occurrence.

Robert B. Thompson, *The Shareholder's Cause of Action for Oppression*, 48 BUS.LAW. 699, 702–03 Feb. 1993.

### B. Alex's Treatment of Minority Shareholders

In 1996, the brother's relationship reached the breaking point when Alex III became interested in buying a piece of property in Columbia. However, according to John, Alex would not hear of it. John told Alex III he would help him buy the property, and Alex III investigated the property along with a real estate agent. Then Alex became interested in the idea and Alex III negotiated to buy the land. After the contract for the land was signed, Alex III, John and Bill Freitag met and changed their minds about the purchase. They agreed not to follow through. Without John's knowledge, Alex instructed Alex III to proceed with the sale since the contract had already been signed.

John discovered the sale was going through when he and Alex III were scheduled to drive to Columbia together. John was hurt and angry because no one had informed him of the change in the decision on the land. John testified he asked Alex III to let him out of the car because he was too upset to be any good at the meeting in Columbia. Alex III agreed John was upset on the Thursday morning they started driving to Columbia and John stated: "your father—he's been trying to get me out of the company, you know, if he wants me out, I've had it. I quit. This is it for me." After letting John out of the car, Alex III immediately called his father on John's cell phone and told him John quit. Alex told Alex III they would make plans on Friday when Alex III got back from Columbia.

The next day, Friday, August 2nd, 1996, John went to work at Atlas as usual. The following Monday, Alex III, Michael, and John ate breakfast together. According to Alex III, they discussed "operation things" as if nothing had happened. At the breakfast it was clear to Alex III that John did not intend to quit, so Alex III went and spoke to Bill Freitag and Alex

about John. John learned from Michael there had been a meeting in which Alex and Alex III and Freitag decided to move John out of the business and replace him.[7] In response to this information, John sent out a memo at Atlas indicating he was not retiring. Later that morning Alex III saw John's letter. He went to his father and Freitag.

Alex III, Alex, and Freitag discussed John's letter. Freitag helped Alex III draft a letter to accept John's resignation. Alex III explained he sent the letter to accept the resignation "[b]ecause [John] had already made it known that he was not—or he had not resigned by putting the letter out prior to that." Alex appointed Alex III as acting president. Alex III testified he feels it is now his "turn."

Soon afterwards, John found a letter on his desk advising him his services were no longer needed at Atlas and that he had "abandoned" his job and would possibly be offered a "consulting" position. Alex, Alex III, and Freitag all apparently concurred in the decision to remove John. The next morning, John went to Alex's home after Alex called him and requested to meet. At the meeting, Alex told John that Alex III would take over as President of Atlas. Alex offered John a "consulting" position. The "consulting position" was apparently never clearly defined.

Michael's testimony and characterization of these events is particularly compelling. Michael documented:

Friday, [August] 2nd –

an operational meeting was held that afternoon; Uncle John was not present and discussion was made in front on (sic) Tommy Compton and others concerning moving forward and making plans without Uncle John. Decisions were made that were typically in his area of responsibility, without his consent. It appeared to me that Alex and Bill took advantage of his absence. It was obvious to me that plans were being made to proceed forward without Uncle John in some capacity, but at this point I was unsure. I was very

---

**7.** Michael corroborated John's testimony he told John the others were planning to remove him.

uncomfortable with this situation, as I felt Tommy and possibly Terry were also.

Regarding John's future with Atlas, Michael stated at trial:
> ... I honestly feel that it will be, you know, impossible for them ever to attend shareholders' meetings, you know, and not ... you know, for them to actually be involved in the company in any capacity, you know, that would not be an adversarial (sic?) relationship, so the best decision for the company and the best decision for them—you know, I really can't say that the best thing is to buy their stock; you know, there may be other alternatives, I don't know.

According to John, Alex refused to buy him out. John returned his company car and Atlas stopped paying John a salary in February or March of 1997.

In September of 1996, John received an offer from Alex and Atlas to buy him out for one million dollars net after reducing for a debt he allegedly owed the company. Freitag estimated John's share of Atlas at more than ten million dollars. Yet Freitag suggested $1 million net for the buyout offer. John rejected the offer because he knew Atlas was earning approximately $26 to 27 million in sales. Atlas had total assets of approximately $17,500,000 and stockholder equity of $13,645,-988. The audited financial documents for the year ending December 31, 1996, reflected Atlas had $3,529,000.43 in cash assets alone. Atlas owns extensive property and carries very little debt.

John later discovered Freitag sent Alex a memo indicating it would be best to buy John out before a large legal settlement was received. Most recently, Atlas offered to buy John and Louise out for $4 million in exchange for a relinquishment of all of their interests in Atlas, its subsidiaries, and the two partnerships—Marica Enterprises, Ltd. and K Enterprises. John and Louise have declined this offer.

Between August 9, 1996, when John was "retired" and February of 1998, John was not aware of, or informed of, any Atlas Board meetings. On March 10, 1998, the Atlas stockholders including John and Louise met. At the meeting, a five-year retirement program of $82,000 a year was approved for John. Alex III was elected President, and a board of directors was elected consisting of Alex, Alex III, and John.

Although John is still on the board of directors, he can be effectively overruled by Alex and Alex III's two vote majority.

At the meeting, John also discovered Atlas's plans for a $14 million expansion. An expenditure of this size is unusual based on Atlas's history, which has always been to spend conservatively and to retain earnings in the corporation. At the time of trial the estimated expenditure for the expansion had increased to $17 million.

Thus, John and Louise found themselves in a situation in which the corporate form itself "further compounds the minority shareholder's dilemma." Robert B. Thompson, *The Shareholder's Cause of Action for Oppression*, 48 BUS.LAW. 699, 703 Feb. 1993.

> Without a job and in the absence of dividends, the minority shareholder may face an indefinite future with no return on the capital he or she contributed to the enterprise. The majority may even be able to deny the minority shareholder any return in the long run by siphoning off corporate assets in the form of high salaries or rents, insulated from judicial review by the business judgment rule. Alternatively, the majority may seek to force the minority shareholder out of the enterprise on terms which the minority shareholder believes are unfair. The two strategies can be combined in a classic squeeze out as the majority first denies the minority shareholder any return and then proposes to buy the shares at a very low price or cashes out the minority shareholder in a merger.

*Id.* at 703–04.

## C. Oppression

John and Louise initiated this action under S.C.Code Ann. § 33–14–300 (1990). Section 33–14–300 provides:

The circuit courts may dissolve a corporation:

in a proceeding by a shareholder if it is established that:

\*    \*    \*    \*    \*    \*

(ii) the directors or those in control of the corporation have acted, are acting, or will act in a manner that is *illegal, fraudulent, oppressive, or unfairly prejudicial* either to the

corporation or to any shareholder (whether in his capacity as a shareholder, director, or officer of the corporation); § 33–14–300(2)(ii) (emphasis added).

The South Carolina legislature broadened the grounds for dissolution by including "oppressive" conduct, which provides a frozen-out minority shareholder with a right of action even when majority conduct does not rise to the level of illegality. *See* Joshua M. Henderson, *Buyout Remedy for Oppressed Minority Shareholders,* 47 S.C.L.Rev. 195, 199 (Autumn 1995).

However, John and Louise seek a buyout rather than a dissolution of Atlas. S.C.Code Ann. § 33–14–310 (1990) lists buyouts as an alternate remedy to dissolution:

> (d) In any action filed by a shareholder to dissolve the corporation on the grounds enumerated in Section 33–14–300, the court may make such order or grant such relief, other than dissolution, as in its discretion is appropriate, including, without limitation, an order:
>
>     *    *    *    *    *    *
>
> (4) providing for the purchase at their fair value of shares of any shareholder, either by the corporation or by other shareholders.
>
> (e) The relief authorized in subsection (d) may be granted as an alternative to a decree of dissolution or may be granted whenever the circumstances of the case are such that the relief, but not dissolution is appropriate.

Significantly, the statute authorizes alternative relief "regardless of whether the oppression by the majority shareholder is sufficiently egregious to warrant dissolution." Henderson at 208–209. In *Hendley v. Lee,* 676 F.Supp. 1317, 1324 (D.S.C.1987), the court held the dissolution statute was merely jurisdictional, and a "prerequisite to obtaining other forms of relief." Similarly, in *Hite v. Thomas & Howard Co.,* 305 S.C. 358, 364, 409 S.E.2d 340, 343–44 (1991), the court found a minority shareholder may allege a ground for dissolution while seeking alternate relief.

Section 33–14–300, does not define oppression or unfairly prejudicial conduct. The comment to S.C.Code Ann. § 33–18–400 (1990), which allows shareholders in a statutory close

corporation to petition for relief on the grounds of oppressive, fraudulent, or unfairly prejudicial conduct states:

> No attempt has been made to define oppression, fraud, or unfairly prejudicial conduct. These are elastic terms whose meaning varies with the circumstances presented in a particular case, and it is felt that existing case law provides sufficient guidelines for courts and litigants.

Comment to § 33–18–400. This legislative decision not to define oppression is apparent in other state corporate statutes as well. *See* Thompson, 48 BUS.LAW. 699, 711. To fill this gap, courts have generally used one of three approaches to define oppression. *Id.*

Oppression "has been defined as a visible departure from the standards of fair dealing and a violation of fair play on which every shareholder who entrusts his money to a company is entitled to rely, and also as a lack of probity and fair dealing in the affairs of a company to the prejudice of some of its members." 56 A.L.R.3d 358, *Corporate Dissolution—Oppressive Conduct* § 2. Additionally, several courts have found oppression when the majority shareholders deprived minority shareholders of participation in management. *Id.* § 3 (*See Maschmeier v. Southside Press, Ltd.,* 435 N.W.2d 377 (Iowa App.1988); *McCauley v. Tom McCauley & Son, Inc.* 104 N.M. 523, 724 P.2d 232 (Ct.App.1986); *In Re Wiedy's Furniture Clearance Center Co.,* 108 A.D.2d 81, 487 N.Y.S.2d 901 (1985); *O'Donnel v. Marine Repair Services, Inc.* 530 F.Supp. 1199 (S.D.N.Y.1982) (applying N.Y. law); *Balvik v. Sylvester,* 411 N.W.2d 383 (N.D.1987)).

The second view of oppression is a breach of the fiduciary duty of good faith and fair dealing. Thompson, 48 BUS.LAW. at 713.

The third approach looks to whether the reasonable expectations of the minority shareholder have been frustrated by the actions of the majority. *Id.* North Carolina has adopted the reasonable expectations approach. *See* Robert S. McLean, *Minority Shareholders' Rights in the Close Corporation Under New North Carolina Business Corporation Act,* 68 N.C.L.Rev. 1109, 1114 (1989) (citing *Meiselman* ). These interpretations are not exclusive. Thompson, 48 BUS.LAW. at 712.

Additionally, several states, like South Carolina, refer to unfair prejudice or to unfairly prejudicial conduct in their dissolution statutes. *Id.* at 713, n. 70 & 84 (citing Alaska, California, Minnesota, Missouri, Montana, Wisconsin, and Wyoming).

Henderson concludes it is

... arguable that the "unfairly prejudicial" standard gives more protection to the minority shareholder than even the "oppressive" standard. Indeed, it almost appears that each successive standard, i.e., illegal, fraudulent, oppressive, or unfairly prejudicial, is more generous to the shareholder than the preceding one.

Henderson, *Buyout Remedy for Oppressed Minority Shareholders,* at n. 7.

South Carolina cases to date have not adopted a particular approach for interpreting oppression.

In *Segall v. Shore,* 269 S.C. 31, 236 S.E.2d 316 (1977), the Supreme Court found shareholders in an action for an accounting were entitled to have their shares redeemed where shareholder executors and trustees misapplied and diverted proceeds for their own personal use. The shareholders withdrew an additional $175,000 after the Supreme Court ordered them to restore profits and account for all funds. The court in this second case, found the defendants had "acted oppressively and unfairly to the interests of the plaintiffs and to their prejudice; and that the business and affairs of these corporations can no longer be conducted to the advantage of the shareholders generally...." 269 S.C. at 37, 236 S.E.2d at 318. *See also Segall v. Shore,* 264 S.C. 442, 215 S.E.2d 895 (1975). The contempt of court aspect present in *Segall* is lacking in the case at bar.

Nonetheless, "a good-faith justification for certain corporate actions will overcome a claim of oppression by dissatisfied minority shareholders." Henderson, *Buyout Remedy for Oppressed Minority Shareholders,* 47 S.C.L.Rev. at 203. For example, in *Roper v. Dynamique Concepts,* 316 S.C. 131, 447 S.E.2d 218 (Ct.App.1994), minority shareholders sought dissolution arguing a new stock issuance was designed to dilute their interest and squeeze them out of the corporation. However, the *Roper* court found the minority shareholders were

afforded preemptive rights to purchase the new stock and none of the minority shareholders exercised this right. Additionally, the company was in dire financial straits and issued the additional stock to raise money to save the company from insolvency, not to dilute the minority shareholder's interest. The court therefore found the minority shareholders did not demonstrate oppression, illegality, breach of fiduciary duty or RICO violations and were not entitled to relief.

In contrast, the record in the instant case is devoid of any good-faith justification for Alex's behavior. Atlas was, and is, in excellent financial condition. Alex's behavior follows the ubiquitous pattern of other cases in which a minority shareholder's employment is terminated from a company, salary and benefits cease, and the shareholder is deprived of participation in management.[8] The record demonstrates this is exactly what happened to John.

> A variety of freeze-out techniques exist, with the withholding of dividends ·being by far the most commonly applied technique. This technique is often combined with the discharge of the minority shareholder from employment and removal of the minority shareholder from the board of directors. If the minority shareholder is employed by the corporation full time, as is typical, and if she relies on her salary as her primary means of obtaining a return on her investment, as is typical, she is suddenly left with little or no income and little or no return on her investment. The controlling shareholders may effectively deprive the minority shareholder of every economic benefit that she derives from the corporation.

*Balvik v. Sylvester,* 411 N.W.2d 383, 387 (N.D.1987) (quoting D. Charles MacDonald, *Corporate Behavior and the Minority Shareholder: Contrasting Interpretations of Section 10–19.1–*

---

8. "Cases in which courts have found oppressive conduct on the part of majority shareholders frequently involve similar factual situations. Typically, the complaining shareholder will claim that she has been 'frozen out' or 'squeezed out' by the majority, which often means that the shareholder's employment with the company has been terminated, compensation (in the form of a salary or dividends) has been cut off, and the shareholder generally has been excluded from participating in the management of the company." Henderson, *Buyout Remedy for Oppressed Minority Shareholders,* 47 S.C.L.Rev. at 201.

*115 of the North Dakota Century Code,* 62 N.D.L.Rev. 155, 164–65 (1986)).

Alex, Alex III, and Freitag removed John as President of Atlas. According to the testimony of Alex III, at the time they removed John, they were aware he was not resigning and wished to remain at Atlas. In fact they "accepted" John's "resignation" after it had already been withdrawn. John's health insurance was canceled, and his loans were called. Meanwhile, Alex, Alex III, Michael, Freitag, and even Alex's wife (who is neither a shareholder nor an employee [9]) continue to receive substantial benefits from Atlas. Atlas paid all of Alex's legal fees in this action. Although cash-heavy, Atlas has not paid a dividend since 1990. Additionally, Alex III is adamantly opposed to a public offering which would provide a market for John and Louise's shares.[10]

Perhaps most disturbing is Atlas' plan for a $17 million expansion that threatens to permanently deprive both John and Louise of *any* return on their investment by diverting Atlas's assets to the expansion. In light of these circumstances, we hold John and Louise are entitled to a buyout of their shares. Although most of the oppressive and unfairly prejudicial behavior was directed at John, Louise also suffered. When Louise saw the strained relations between Alex and John, she approached Alex and asked what could be done. Alex responded by telling her she was no longer a part of his family. Because Louise has supported John, she has been ousted from the family and concomitantly from any future role in Atlas.

■■■ We conclude the terms "oppressive" and "unfairly prejudicial" should be given a broad and liberal interpretation and application. We hold the terms "oppressive" and "unfairly prejudicial" mean:

1) A visible departure from the standards of fair dealing and a violation of fair play on which every shareholder who entrusts his money to a company is entitled to rely; *or*

---

9. Atlas provided Alex's wife with a car and health insurance.

10. Since Alex III became president, there have been no meetings about an IPO. Alex III stated: "If I personally have anything to do with it, we'll never do [an IPO.]"

2) A breach of the fiduciary duty of good faith and fair dealing; *or*

3) Whether the reasonable expectations of the minority shareholders have been frustrated by the actions of the majority; *or*

4) A lack of probity and fair dealing in the affairs of a company to the prejudice of some of its members; *or*

5) A deprivation by majority shareholders of participation in management by minority shareholders.

## IV. Accounting

The trial court ruled an accounting is necessary to determine what distributions and payments were made in 1988, and thereafter, and what effect Louise's reduced stock ownership had on the payments or distributions due her. It is required to determine the effect of Alex's treatment of the 21 percent interest in Marica as the property of Michael and Alex III, when in fact it was owned by K Enterprises in which John and Louise were partners. An accounting must determine whether Michael and Alex III made any payments on the note for the Marica stock. We find, for the same equitable reasons John and Louise are entitled to a buyout of their shares, they are also entitled to an accounting. An accounting is mandatory to determine damages resulting from the fraud.

## V. Atlas's Counterclaims

In the present action, Alex and Atlas filed several counterclaims against John. These counterclaims alleged John owed Atlas: 1) $375,000 for a construction loan; 2) $25,000 for 1993 income taxes; 3) $36,000 for a real estate loan; and 4) $140,000 for the purchase of a yacht. Marica Enterprises, Ltd. also asserted a counterclaim against John. This claim alleged John was obligated to pay $163,087.00 to his capital equity account.

The trial court held: 1) Atlas established by a preponderance of the evidence that John received a loan for $375,000; 2) at the second hearing, judgment will be entered for Atlas for the amount due including interest; 3) Atlas abandoned the $25,000 counterclaim by failing to present evidence supporting it at trial; 4) Atlas failed to carry its burden of establishing

John owes $36,585.07 allegedly used for his wife's bed and breakfast; 5) John conceded owing $140,000 for the purchase of a boat; 6) the second hearing will determine the exact amount due, including interest; 7) Atlas contended in its post-trial brief, John owed K Enterprises $85,229.00, however, Atlas did not include claims for this alleged negative balance in their counterclaim. Therefore, they may not now pursue this claim; and 8) Marica failed to introduce evidence of why or how John owed the alleged $133,932 negative balance in his Marica equity account.

The November Order held Atlas did not produce evidence as to how the negative balances occurred. No note is in evidence for repayment. Further, there was no evidence of a Marica Enterprises, Ltd. partnership provision requiring repayment. Other partners also have negative balances. John conceded he owes Atlas $140,000 which he used to purchase a boat. John testified other shareholders have borrowed money from Atlas and have not been sued for repayment. John contended at trial, money from his Marica Enterprises, Ltd. equity account was used to pay taxes on the Bijou property, however, all of the income from the property went into the joint account with Alex. John's testimony was later corroborated by Henry Harrison, the Former IRS Investigator, who concluded John's equity account in Marica Enterprises, Ltd. reflects a negative balance because the partnership paid John's tax liabilities and expenses on the Wade Hampton property, which John did not own, and for which Alex received the income. Appellants made no showing of how the negative balances resulted from a loan to John or that John was expected to repay these amounts.

## CONCLUSION

We hold:

1) John A. Kiriakides and Louise Kiriakides are entitled to a judicial buyout of their minority shares by Atlas;

2) John A. Kiriakides and Louise Kiriakides are entitled to an accounting to determine whether they incurred any damages as a result of fraud committed by Alex Kiriakides, Jr. in the transfer of 21 percent interest in Marica stock;

3) Louise Kiriakides is entitled to an accounting to determine whether she incurred any damages as a result of fraud committed by Alex Kiriakides, Jr. in regard to Louise's stock ownership in the 1990 distribution;

4) John A. Kiriakides and Louise Kiriakides are entitled to an accounting to determine what distributions and payments were made by Alex Kiriakides, Jr., and the effect upon John A. Kiriakides and Louise Kiriakides;

5) Atlas is entitled to a hearing to determine the amount now owed on a $375,000 construction loan by John A. Kiriakides and the amount now owed on the $140,000 for the purchase of a boat; and

6) Atlas's counterclaims against John A. Kiriakides for: a) $25,000 for 1993 Income taxes; b) $36,585.07 for real estate loan for wife's bed and breakfast business; and c) $133,932 claim for negative balance in Marica Equity Account; are all dismissed with prejudice.

Accordingly, the judgment of the trial court is **AFFIRMED** and the case is **REMANDED** for further action by the circuit court consistent with this opinion.

CONNOR, J., concurs.

HOWELL, C.J., concurs in a separate opinion.

HOWELL, Chief Judge (concurring):

I agree with the result reached by the majority. However, I would simply adopt the Special Referee's order and incorporate it as the opinion of this court as it is written.

The facts in this case clearly support the conclusion reached by the Referee that a forced buyout was the appropriate remedy afforded under the terms of the statute. *See* S.C.Code Ann. §§ 33–14–300 and 33–14–310 (1990). Taking our own view of the preponderance of the evidence, it is unnecessary to define "oppression" or "unfair prejudice" because there is ample evidence of both, giving these terms their plain and ordinary meaning. To define either based on foreign cases, treatises, and law review articles needlessly expands the law and may impact future cases with unforeseen and unintended consequences.

Furthermore, I would not go so far as to order an accounting beyond that which the Referee ordered.