2202

Benny R. ROPER, Deane McKinley, Ed Revis and Sandy Tucker, Appellants v. DYNAMIQUE CONCEPTS, INC., Keith R. Cossairt, Herbert W. Mitchum, Graydon F. Vadas, Robert H. Rhames, H.A. Kallio, J. Brent Holcomb, CSX Corporation, Inc., Edward Wovas and Roger Posey, Respondents.

(447 S.E. (2d) 218)

Court of Appeals

*Robert C. Wilson, Jr.*, Greenville, *for appellants.*

*Julianne Farnsworth* and *Leslie S. Rogers, McNair & San-ford*, Columbia, and *James A. Bell*, St. George, *for respon-dents.*

Heard May 10, 1994.

Decided July 18, 1994; Reh. Den. Aug. 31, 1994.

CURETON, Judge:

Benny R. Roper, Deane McKinley, Ed Revis, and Sandy Tucker, minority shareholders in Dynamique Concepts, Inc. (DCI), brought an action seeking injunctive relief, a judicial dissolution, and damages against DCI and the majority share-holders, Keith Cossairt, Herbert W. Mitchum, Graydon F. Vadas, Robert H. Rhames, H.A. Kalio, and J. Brent Holcomb, as well as principals of CSX Corporation, Inc., Edward Wovas and Roger Posey (respondents), for alleged oppressive and il-legal activities, breach of fiduciary duties, and violation of the Racketeer Influenced and Corrupt Organizations (RICO) statute. The respondents counterclaimed for intentional inter-ference with prospective contractual relations, violations of Securities Exchange Act of 1934, civil conspiracy, fraud and

corporate waste. They also sought an accounting.[1] The trial court directed a verdict in favor of the respondents on the RICO claims and directed a verdict in favor of the minority shareholders on the counterclaims. The court also conducted an accounting, and denied the minority shareholders' request for judicial dissolution. The minority shareholders appeal. We affirm.

DCI was formed in May 1991 to develop and market a revolutionary type of pump[2] invented by Keith Cossairt. In the early part of 1990, Cossairt contacted Deane McKinley, a stockbroker, concerning the patent which was pending for the pump and sought assistance in obtaining investors to develop and market the pump. McKinley in turn formed a group which included himself, Ed Revis, a banker, and Benny Roper, a technician. Revis and McKinley were each issued 100 shares, and Roper 50 shares of stock in DCI in exchange for future services to be rendered to the corporation. At this point, Cossairt held 598 shares of stock in DCI. According to McKinley, Cossairt represented he, Revis and Roper would each receive ten percent ownership of the company, while Cossairt would retain seventy percent. The other appellant, Sandy Tucker, was hired as an engineering employee of the corporation on June 1, 1991. As a result of her employment with DCI, she was issued 40 shares of stock.

The initial goal of DCI was to develop and test the pump and, eventually, to market it. In an attempt to generate interest in the pump, Cossairt contacted Roger Posey, a CSX Corporation official. After seeing a demonstration of the pump, Posey expressed interest in the pump's potential. Posey introduced Graydon Vadas to the corporation as a potential investor and/or employee who could assist DCI in developing its product. Vadas was hired to be the president of DCI, and was

---

[1] The majority shareholders also cross-claimed against J. Phillip Suddeth and Sandy Tucker. Tucker subsequently joined as a plaintiff in this action, and Suddeth was dismissed from this lawsuit prior to trial after he withdrew his investor agreement and turned his shares of stock over to the Greenville County Clerk of Court pending final resolution of this matter. Additionally, shortly before trial, CSX Corporation, Inc., Edward Wovas, and Roger Posey were dismissed from the suit.

[2] The pump, unlike conventional pumps, has no moving parts, and is described as ingeniously simple with unlimited potential applications. Presumably, since the pump can cheaply and efficiently replace far more cumbersome pumps in many applications, it has the potential to be highly profitable.

issued 50 shares of stock. After Vadas was named President and Chief Operating Officer of DCI, McKinley was named Vice-President of Marketing as well as Secretary-Treasurer; Revis was elected Vice-President of Finance; and Cossairt became Chairman of the Board.

The remaining investors in DCI were cash investors and received stock in exchange for their cash contributions. Robert Rhames, a client of McKinley, and Phil Suddeth, a friend of Revis, were the initial cash investors in the corporation. Rhames contributed $50,000 in exchange for ten shares or one percent of the company. Suddeth also invested cash, but later withdrew from his investor agreement. In July 1991, H.A. Kallio, J. Brent Holcomb, and Hubert W. Mitchum, friends of Rhames, were contacted about investing in the corporation. Kallio and Holcomb each invested $10,000 in the corporation and received 5 shares each. Mitchum invested $20,000 for 10 shares.

Demonstrations of the pump were given to several different companies in an attempt to obtain capital investment to fund the research, development and marketing of the pump. DCI received some promising feedback for applications for the pump ranging from toilets, to dry cleaning, to cement, to furniture manufacturing. However, other than the capital provided by the cash investors, the only funds generated were $9,500 which CSX agreed to pay for a pump prototype to be built. Consequently, Vadas wanted DCI to focus on the plastic pellet removal application for CSX because CSX was big enough to protect the technology and serve as a "big brother" to DCI.

The minority shareholders ultimately became concerned that Vadas's sole focus on CSX was not productive. They also became concerned that Vadas was improperly spending corporate money in an attempt to secure a CSX contract. Furthermore they were concerned about a $10,000 personal loan from Vadas to Posey, a CSX employee, who began to pay back the loan only after litigation began. The minority shareholders also claimed Vadas gave a $2,500 check to Spera, another CSX employee. Spera refuted this claim, testifying that Mitchum sent him a check for $2,500 for reimbursement for work done on a DCI project, but after discussing it with his supervisor, he sent the check back to DCI.

At one point, McKinley recalled Vadas claiming DCI had a contract with CSX. Cossairt also believed a contract existed at one time. According to Posey, however, there never was an agreement between CSX and DCI. Without any incoming funds, by the middle of September 1991, the economic forecast for DCI was bleak. On September 16, 1991, the corporation held a shareholders meeting and Revis reported that DCI would be out of funds by the end of the month. At the meeting, several solutions were suggested to solve the financial dilemma. The proposed solutions involved shareholders contributing funding equal to the percentage of their ownership in the corporation or pledging some of their shares to the corporation for sale. Most of the shareholders agreed to contribute either money or shares, a couple of the shareholders were undecided, and McKinley refused to contribute anything. After further discussion, the meeting became heated and eventually adjourned with the shareholders unable to agree to a resolution of the financial crisis.

By early October 1991, the company had exhausted all of its financial resources, accounts payable exceeded $35,000 and DCI was on the verge of bankruptcy. Furthermore, Cossairt was personally on the brink of bankruptcy. Creditors were calling regarding overdue bills, the corporation was being evicted from its place of business, and creditors were threatening to place a lien on the pump.

Because of his bleak financial situation, Cossairt negotiated with Mitchum to sell 500 shares of Cossairt's stock for $50,000. As additional consideration for the stock, Mitchum promised to obtain or loan money for the corporation to pay off its bills. According to Mitchum, his specific representation to Cossairt was that he would pursue contracts, diversify the company, and get some stock issues so as to attract "investors with some money that could really get things to going." Simultaneously, Mitchum arranged for a licensing agreement between the company and Cossairt. Mitchum then paid a number of DCI's outstanding bills. After purchasing the 500 shares from Cossairt, Mitchum owned fifty-one percent of the corporation's shares. Mitchum then sold some of the shares he had purchased from Cossairt to Rhames and Vadas, retaining 210 shares.

A shareholders meeting was called for November 6, 1991,

and all the shareholders except Sandy Tucker were present. Two different plans were proposed at the meeting, both of which involved the issuance of additional shares of stock to raise working capital for the corporation. Under Plan A, the company would rearrange its stock, devaluing the existing shares. Under Plan B, the company would sell an additional 19,000 shares at $10 per share, with first option to purchase going to existing shareholders. This plan included preemptive rights enabling all existing shareholders to purchase additional shares at $10 per share on a pro rata basis. Mitchum explained he and others anticipated needing $850,000 to $900,000 to run the company for the next year. McKinley, Roper and Revis refused to go along with either proposal, and left the meeting. The remaining shareholders passed Plan B. Following the meeting, registered letters were sent to the minority shareholders informing them that Plan B had been approved, and that they had until November 18, 1991 to exercise their preemptive rights to purchase additional shares pursuant to the plan. None of the minority shareholders exercised their preemptive rights, and, instead, on November 20, 1991, filed this lawsuit.

Although various causes of action were pleaded by the minority shareholders, the essence of their complaint is that the majority shareholders' conduct in voting to issue 19,000 additional shares of stock was designed to dilute the minority shareholders' interest in the company and squeeze them out of the corporation. The majority shareholders answered th complaint denying that the purpose of the stock issue was to dilute the minority shareholders' interest and asserted the stock issue was necessary to save the corporation from insolvency.

The minority shareholders initially hired Hal Warlick to represent them, but subsequently substituted current counsel. The case was tried November 30, 1992 and December 1, 1992. The trial judge issued his final order March 1, 1993, and modified it on March 19, 1993. In the interim, the judge conducted a hearing on January 8, 1993 on a motion to dismiss a claim filed by former counsel Warlick against the minority shareholders for nonpayment of a contingent attorney fee. Claiming the trial judge was unavoidably exposed to the denigration of them and the merits of their claim by their former

counsel at the hearing on the motion, the minority shareholders moved that the trial judge recuse himself and/or grant a new trial.

The court denied the minority shareholders' motions for recusal and/or a new trial because the court's objectivity was not affected by inadvertent knowledge obtained during the hearing in the Warlick case. Moreover, it found any issues concerning money had already been ruled upon by it at trial, prior to any knowledge it may have acquired in the Warlick case.

The court also granted a directed verdict on the minority shareholders' RICO claims, ruling the alleged predicate acts did not establish a pattern of racketeering. Finding no evidence of securities violations, fraud, corporate waste, or a breach of any obligation to the majority shareholders, the court directed a verdict in favor of the minority shareholders on the majority shareholders' counterclaims.

The court further held the minority shareholders did not acquire a non-dilutable fixed percentage interest in DCI. The court concluded that the various stock issues and transfers, while not technically conducted according to statutory provisions, should nonetheless be confirmed.

Finally, the court denied the minority shareholders' request to judicially dissolve the company. The court reasoned "the corporation was grossly undercapitalized at its inception. To stay in business, investors were sought to provide additional capital and liquidity. This influx of new money spawned an internal power struggle and that, coupled with the unwillingness of the 'sweat equity' shareholders to invest any new funds, landed this case in court." The court elaborated that the company owns a valuable asset in the patent right on the pump, and that dissolution would devalue that asset.

## I.

On appeal, the minority shareholders first claim that the trial judge's objectivity was adversely affected by the Warlick hearing and that he should have recused himself from further consideration of this matter and granted them a new trial. As evidence of the judge's bias, the minority shareholders point to the fact that before the Warlick hearing, the judge indicated he was considering freezing the ownership of the com-

mon stock for twelve months, but after the Warlick hearing, he decided not to follow that course of action.

Canon 3(C)(1)(a) of the Code of Judicial Conduct, Rule ■ 501, SCACR, requires a judge to rescue himself if he "has a personal bias or prejudice concerning a party." The alleged bias must stem from an extrajudicial source and result in a decision based on information other than what the judge learned from his participation in the case. *Reading v. Ball*, 291 S.C. 492, 354 S.E. (2d) 397 (Ct. App. 1987). It is not enough for a party to simply allege bias; a party seeking disqualification of a judge must show some evidence of bias or prejudice. *Id.; see also Rogers v. Wilkins*, 275 S.C. 28, 267 S.E. (2d) 86 (1980).

In the instant case, the trial judge concluded that his ■ objectivity in rendering a decision was not affected by inadvertent knowledge obtained during the Warlick hearing. He further concluded that any issues concerning money had already been ruled upon at trial, prior to any knowledge of the Warlick suit. We find the minority shareholders' contention insufficient to establish that the trial judge's ultimate ruling was influenced by his participation in the Warlick hearing. In fact, the minority shareholders presented no factual record for this Court to review as to exactly what the trial judge was exposed to at the hearing that constituted "denigration of the [minority shareholders] and of the merits of their case." A judge is not required to recuse himself merely because he presided over other proceedings on the same or related cases. *United States v. Parker*, 742 F. (2d) 127 (4th Cir. 1984); *see also Payne v. Holiday Towers, Inc.*, 283 S.C. 210, 321 S.E. (2d) 179 (Ct. App. 1984) (when no evidence of bias is presented other than prior appearances by a party in other cases which resulted in "adverse" rulings by the judge, the judge is not required to recuse himself). Accordingly, the trial judge did not err in refusing to recuse himself or to grant a new trial.

## II.

The minority shareholders next maintain the trial judge erred in failing to allow them to amend their pleading to conform to the proof presented at trial. We disagree.

In order to prove their cause of action against the majority shareholders under 18 U.S.C. § 1962 (1984 & Supp. 1993) ("RICO"), the minority shareholders were required to prove the majority shareholders committed two or more "predicate acts" which constitute a "pattern of racketeering activity" under 18 U.S.C. § 1961 (1984 & Supp. 1993). In their amended complaint, the minority shareholders alleged three predicate acts which they contended constituted racketeering activity under § 1961. At the close of their case, the minority shareholders moved to again amend their pleading pursuant to Rule 15(b), SCRCP, to include a violation of S.C. Code Ann.§ 35-1-1210 (1987),[3] as an additional predicate act under RICO. After a lengthy discussion between the trial judge and the minority shareholders' counsel, the trial judge clearly granted the minority shareholders' motion to amend to include a violation of S.C. Code Ann. § 35-1-1210.[4] However, in his order, the trial judge stated:

> Plaintiff attempted to amend the pleading to conform to the evidence at the conclusion of the plaintiff's case to add new predicate acts over and above what was contained in the Amended Complaint. The motion was denied.

Despite this language, it is clear from the record the trial judge considered the minority shareholders' argument that the majority shareholders committed a predicate act under RICO by violating 35-1-1210. The trial judge simply rejected this argument. After allowing the amendment, the court cautioned it was allowing the amendment for the purpose of "getting all [of their] issues on the table," but that did not mean it agreed their evidence or proof presented at trial established the predicate act under RICO. In ruling on the RICO claim, the judge further stated, "[e]ven allowing you to amend and taking it up and then ruling on it . . . I'm going to direct a ver-

---

[3]S.C. Code Ann. § 35-1-1210 (1987) criminalizes any course of business which would operate as a fraud or deceit in connection with the offer, sale or purchase of any security.

[4]The trial judge stated, "For the purpose of ruling on your motion I'm going to allow you to amend and to include 35-1-1210 to the extent that it relates to your predicate acts." The minority shareholders' attorney responded, "[t]he Court has graciously granted my motion to permit Section 35-1-1210 as a basis under Section 1961(1)(a). . . ."

dict against you, Sir, on the RICO action . . . I fail to see that you have established any pattern of racketeering in the record. Even giving you the most liberal interpretation of that last ruling, it's just not a racketeering case."

Even if the language in the order could be construed as a refusal to allow the amendment, the minority shareholders can prove no prejudice in light of the trial judge's unequivocal rejection of their theory and comment that the evidence, in any event, did not establish a predicate act or pattern of racketeering under RICO. *See Baxley v. Rosenblum*, 303 S.C. 340, 400 S.E. (2d) 502 (Ct. App. 1991) (no error in refusing to allow amendment of pleading at close of evidence when evidence did not support proposed amendment). Thus, since it is clear the trial judge considered the argument regarding a violation of § 35-1-1210 before ruling on the RICO claim, we find no prejudicial error.

### III.

The minority shareholders next argue the trial judge erroneously held they failed to prove Vadas committed the predicate acts necessary to sustain their RICO action. They alleged that Vadas engaged in three predicate acts which constituted a pattern of racketeering: (1) two instances of bribery where $10,000 and $2,500 were paid to CSX officials; (2) mail fraud resulting from the mailing of the alleged bribery checks; and (3) a violation of S.C. Code Ann. § 35-1-1210 (1987).

The trial judge held the alleged predicate acts were not supported by the evidence, and there was no legal or factual basis for these contentions. He further ruled that none of the three acts relied upon by the minority shareholders constitutes racketeering activities under the definitions delineated in 18 U.S.C. § 1961(1)(A) and (B), and, therefore, he granted a directed verdict as to all of the minority shareholders' allegations of RICO violations.

On appeal from an order granting a directed verdict, the appellate court views the evidence and all reasonable inferences from the evidence in the light most favorable to the party against whom the directed verdict was granted. If the evidence as a whole is susceptible of only one reasonable inference, no jury issue is created and the motion was properly granted. *Whelan v. Welch*, 304 S.C. 548, 405 S.E.

(2d) 836 (Ct. App. 1991); *unlimited Services, Inc. v. Macklen Enterprises, Inc.*, 303 S.C. 384, 401 S.E. (2d) 153 (1991).

Viewing the evidence and all reasonable inferences therefrom in the light most favorable to the minority shareholders, we find no evidence which presents a jury question as to the establishment of the predicate acts necessary to maintain a RICO action.

In order to establish a RICO violation, the minority shareholders were required to establish the following: (1) the commission of two or more "predicate acts" (2) constituting a "pattern" (3) of "racketeering activity" through which (4) the culpable person (5) invests in, maintains an interest in, participates in, or conspires to do any of the preceding in (6) an enterprise, and (7) such activities affect interstate commerce. 18 U.S.C. § 1961-1962 (1984 & Supp. 1993). Racketeering activity as defined in § 1961(1) includes bribery as one of the five groups of illegal activity, commonly referred to as "predicate acts."

The first act the minority shareholders contend is a predicate act is that Vadas paid $10,000 to Roger Posey, an official of CSX, to bribe him to recommend Vadas to the shareholders of DCI as the person to run the corporation. As relates to this claim, the trial judge held first, Vadas' conduct does not constitute racketeering activity under 18 U.S.C. § 1961(1)(A) or (B), and second, no evidence was presented that Vadas' conduct amounted to bribery. Instead, the judge ruled, the only evidence on point shows that Vadas loaned this sum to Posey, a friend and business associate, as a personal loan in October of 1991, months after Vadas became an employee of DCI in May of 1991. We agree. The evidence adequately sustains this ruling.

The second act the minority shareholders contend constitutes a predicate act is Vadas' payment of $2,500 out of funds belonging to DCI to John Spera, a CSX employee, in an alleged attempt to bribe Spera to render a favorable decision in the purchasing and marketing of the products being developed by DCI. The trial judge found this alleged predicate act was totally unsupported by any evidence.

We agree with the trial judge that Vadas' conduct does not constitute racketeering activity under 18 U.S.C. § 1961(1)(A) or (B) as a matter of law. Under this Section, bribery constitutes racketeering activity if:

(1) it is chargeable under state law and punishable by imprisonment for more than one year, § 1961(1)(A), or (2) if the act of bribery is indictable under 18 U.S.C. § 201, § 1961(1)(B).

The alleged bribery in this case is not chargeable under state law because the state statutes dealing with bribery are inapplicable to this case. Section 16-9-210, et seq., which prohibits giving or offering bribes to executive, legislative, or judicial officers, to corrupt jurors, arbitrators, umpires or referees, or to induce another to procure public office, is inapplicable. The common law definition of bribery is likewise inapplicable because it only applies to corrupt payments to a public officer or other person connected with the government. *See State v. Meehan*, 160 S.C. 111, 158 S.E. 151 (1931). Section 16-17-540, which prohibits bribery with respect to agents, servants or employees, is inapplicable on its face because it is not punishable by imprisonment for more than one year.

Finally, Vadas' conduct does not constitute bribery under 18 U.S.C. § 1961(1)(B) either. This Section provides that bribery constitutes racketeering activity if it is indictable under 18 U.S.C. § 201. Section 201 only prohibits bribery of public officials and witnesses and, thus, is inapplicable to the instant case.

Because Vadas' conduct does not constitute bribery under either state or federal law, and consequently cannot constitute racketeering activity, we affirm the trial court's grant of a directed verdict on this issue. Furthermore, after reviewing the entire record in this case, we agree with the trial judge that the minority shareholders presented no evidence which established that Vadas gave Spera any money, or that the money given to Posey was anything other than a loan. As such, the trial court correctly held that neither payment constituted a predicate act under RICO.

The next act the minority shareholders contend constitutes a predicate act is mail fraud. The basis of this allegation is the two bribery claims. The minority shareholders contend Vadas' conduct in mailing checks for the purpose of bribery involved the interstate transportation of cash and the negotiation of checks through the Federal Reserve System, thus constituting mail fraud under 18 U.S.C. § 1341 (Supp. 1993).

Since we sustained the trial court's finding that Vadas' conduct did not constitute bribery, the mail fraud allegation must also fail.

The final predicate act relied upon by the minority shareholders is Vadas' violation of § 35-1-1210 by engaging in a scheme to depress the corporation's financial condition by withholding the CSX contract, in order to take over the corporation. At trial, the judge rejected this theory, finding there was no legal or factual basis for it.

Viewing the evidence in the light most favorable to the minority shareholders, we also reject this theory. There is no evidence in the record to support the assertion that Vadas depleted the corporation's resources or depressed the corporation's financial condition by withholding the CSX deal. Rather, as noted by the trial judge, the record reveals that DCI was grossly undercapitalized at its inception, and that it quickly expended the little money it did have to pay rent, salaries, and other expenses. Hence, the trial court committed no error in directing a verdict in favor of the majority shareholders. We accordingly affirm his decision holding that the minority shareholders failed to prove Vadas committed the predicate acts necessary to sustain their RICO action.

## IV.

Finally, the minority shareholders contend that the majority shareholders should be forced to buy out their shares at a price of $2,000 to $2,400 per share. This is necessary, they argue, because DCI did not need to issue any additional shares of stock, and did so for the sole purpose of diluting their interest in DCI.

The minority shareholders rely on *Browning v. C&C Plywood Corp.*, 248 Or. 574, 434 P. (2d) 339 (1967), and *Gaines v. Long Mfg. Co., Inc.*, 234 N.C. 340, 67 S.E. (2d) 350 (1951), in support of their contention that they are entitled to relief. In *Browning*, the court held the minority shareholder was entitled to relief because the increased stock issue served "no corporate purpose" in that the corporation did not need the additional capital. In addition, the testimony and other evidence revealed the actual purpose of the stock issue was to dilute the minority shareholder's interest in the corporation. Likewise, in *Gaines* the court refused to dismiss a complaint by a minority shareholder which alleged the corporation did not

need additional working capital, the corporation wrongfully refused to declare a dividend, and the corporation issued additional stock for the purpose of "freezing out" the minority shareholder.

These cases, however, are inapposite to the factual situation before us. Here, the record clearly reflects DCI was in serious financial trouble, and the additional stock issue was a last-ditch effort to save the corporation. The circumstances of this case are more akin to a federal case cited by the majority shareholders, *Bellows v. Porter*, 201 F. (2d) 429 (8th Cir. 1953). In *Bellows*, the corporation issued additional stock because the corporation was on the verge of insolvency. The minority shareholder was offered the opportunity to purchase his proportionate share of the additional stock, but declined to do so. Instead, the minority shareholder sued, claiming the additional stock issue was for the purpose of diluting his shares in the corporation. The court denied relief to the minority shareholder, finding there was no evidence the stock issue was not required, that it was not in the interest of the corporation, or that it was done in bad faith or to defraud the minority shareholder.

Here, as in *Bellows*, the evidence demonstrates that the additional stock issue was  good-faith effort to keep the corporation in business. A review of DCI's financial condition shows the company was on the verge of bankruptcy. Although Mitchum had contractually agreed to use his "best efforts" to raise one million dollars for the corporation, this proposal would not generate sufficient immediate capital to sustain the corporation in that it involved bringing in new investors, pursuing a partnership with CSX, and selling additional shares of stock. As the trial judge noted in denying judicial dissolution, "this case amounts to nothing more than a power struggle and the use of acceptable tactics . . . [t]he best for all concerned is to loosen the strangle-hold of litigation upon the corporation and allow it further develop, produce, and market its product."

We agree with the court's account of the situation, and accordingly, deny the minority shareholders' requested relief. The judgment appealed from is affirmed.

Affirmed.

HOWELL, C.J., and SHAW, J., concur.