541 S.E.2d 257

John A. KIRIAKIDES and Louise Kiriakides, Respondents,

v.

ATLAS FOOD SYSTEMS & SERVICES, INC., Marica Enterprises, Ltd., Marica, Inc., and Alex Kiriakides, Jr., Petitioners.

No. 25244.

Supreme Court of South Carolina.

Heard Sept. 19, 2000.

Decided Jan. 29, 2001.

588

Deborah H. Sheffield, of Columbia, Ellis M. Johnston, II, of Haynsworth Sinkler & Boyd, of Greenville, and David Holmes, of Greenville, for petitioners.

Wilburn Brewer, Thomas L. Stephenson, and Charles W. Emory, Jr., all of Nexsen, Pruet, Jacobs & Pollard, L.L.P., of Columbia, and George J. Conits, of Greenville, for respondents.

TOAL, Chief Justice:

We granted a writ of certiorari to review the Court of Appeals' opinion in *Kiriakides v. Atlas Food Systems*, 338 S.C. 572, 527 S.E.2d 371 (Ct.App.2000). We affirm in result, as modified.

## FACTS

This is a case in which respondents, minority shareholders in a closely held family corporation, claim the majority shareholders have acted in a manner which is fraudulent, oppressive and unfairly prejudicial.[1] They seek a buyout of their shares under South Carolina's judicial dissolution statutes. A rather detailed recitation of the facts is necessary to an understanding of the plaintiffs' claims.

Respondents are 72–year–old John Kiriakides and his 74–year–old sister Louise Kiriakides. John and Louise are the minority shareholders in the family business, Atlas Food Systems & Services, Inc. (Atlas). Petitioners are their older brother, 88–year–old Alex Kiriakides, Jr., and the family

---

**1.** *See* S.C.Code Ann. §§ 33–14–300 & 33–14–310 (1990).

business and its subsidiaries, Marica Enterprises, Ltd. (MEL),[2] and Marica, Inc. (Marica).[3]

Atlas is a food vending service which provides refreshments to factories and other businesses. The business began prior to World War II but slowed down while Alex was away during the war. After the war, Alex, John, and their father Alex, Sr., began working together to build the family business.[4] Alex, Sr. died in 1949. Atlas was incorporated in 1956. Currently, Alex is the majority

stockholder, owning 57.68%; John owns 37.7%, and Louise owns 3%.

Throughout Atlas' history, Alex has been in charge of the financial and corporate affairs of the family business; he has had overall control and is Chairman of the Board of Directors. John is also on the three member Board. In 1986, John became President of Atlas, after years of running client relations and field operations. Two of Alex' children are also employed by Atlas, his son Alex III, and his daughter Mary Ann.[5] Alex III is (since John's departure as discussed below) President and is on the Board; Mary Ann is a CPA who performs accounting and financial functions; their brother Michael worked for Atlas in the past, but is no longer employed there.[6]

For years, Atlas operated as a prototypical closely held family corporation. Troubles developed, however, in 1995, when a rift began between Alex and John. The initial dispute arose over property owned by John and Alex in Greenville.

---

2. MEL is a limited partnership used for estate planning.

3. Marica is a wholly owned subsidiary of Atlas and is primarily an investment arm of the corporation.

4. There is much dispute between the parties as to who did precisely what, but these matters are not dispositive of the issues on appeal. Suffice to say that, by the 1950's, Alex, John and their brother George, now deceased, were operating the family business.

5. Neither John nor Louise have any children; Alex has four children: Alex III, Michael, Mary Ann and Cathryn.

6. Louise worked for several years in the counting room but has not worked for the company since the 1970's. She served as Secretary until 1988.

Alex convinced John to transfer his interest in the property to his son Alex III for a price less than it was worth. John signed the deed prepared by Alex believing he was conveying only a small portion of his interest in the property to Alex III. After discovering his entire interest had been transferred to Alex III, John became distrustful of Alex and began requesting documents and records concerning the family business. The relationship between the two became very strained.[7] Several subsequent incidents served to heighten the tension.

In December 1995, the Board and shareholders of Atlas decided to convert Atlas from a subchapter C corporation to a subchapter S corporation. However, in March 1996, Alex, without bringing a vote, unilaterally determined the company would remain a C corporation. Later, in mid–1996, a dispute arose over Atlas' contract to purchase a piece of commercial property. Notwithstanding the contract, John, Alex III and William Freitag (Senior Vice President of Finance and Administration) decided not to go through with the sale. Alex however, without consulting or advising John, elected to go through with the sale. When John learned of Alex' decision, he became extremely upset and allegedly advised Alex III he was quitting his job as President.[8] The next day, Alex III made plans with managers to continue operations in John's absence; John, however, went to the Atlas office in Greenville and visited Atlas offices in Columbia, Orangeburg and Charleston.

The following Monday, John went to work at Atlas doing "business as usual." He was told later that day (by Alex' son Michael) that management was planning John would no longer be President of Atlas. John circulated a memo indicating he intended to remain President; Alex III replied in a memo prepared with the aid of his father, refusing to allow John to continue as president of the company. The following day,

---

7. Alex ultimately entered into an exchange of properties to settle this dispute, and John signed a release. This incident, therefore, was not relied upon by the referee with regard to his findings of fraud or his buyout order. Although this incident is not an issue before this Court, it is conveyed to relate the factual background giving rise to the parties' dispute.

8. The referee found John subsequently made it clear he had no intentions of quitting.

Alex refused to allow John to stay on as president of Atlas, and designated Alex III as President. John was offered, but refused a position as a consultant.

In September 1996, Atlas offered to purchase John's interest in Atlas, MEL and K Enterprises,[9] for one million dollars, plus the cancellation of $800,000 obligations owed by John. John refused this offer, believing it too low.[10] John filed this suit in November 1996, seeking to obtain corporate records. The complaint was subsequently amended, naming Louise as a plaintiff, and adding claims for fraud under the judicial dissolution statute. The complaint sought an accounting, a buyout of John and Louise's shares, and damages for fraud. The trial was bifurcated on the issues of liability and damages.

After a five day hearing, the referee found Alex had engaged in fraud in numerous respects, and found Atlas had engaged in conduct which was fraudulent, oppressive and unfairly prejudicial toward John and Louise. The referee held a buyout was the appropriate remedy under S.C.Code Ann. § 33–14–300(2)(ii) and § 33–14–310(d)(4).[11] The referee found that, at the bifurcated damages hearing, it would be determined whether John and Louise had suffered any damages from the fraud in this regard.[12] The Court of Appeals affirmed in result.

---

9. K Enterprises is a general partnership created in 1982 to invest profits in government exempt bonds. It is owned by Alex (49%), John (32%), Alex III(12%), and Louise (7%).

10. In March, 1998, Atlas offered to buy the interests of John and Louise for four million dollars, less obligations of $825,000. John was advised by a tax attorney in 1995 that his stock in Atlas was worth about ten million dollars.

11. Section 33–14–310(d)(4) permits a court to order a buyout of shares rather than dissolving the corporation.

12. The referee also ordered an accounting a) with respect to distributions made to Louise based upon her ownership of 271 shares of stock when she, in fact, owns 301 shares, and b) with respect to 21% of Marica stock, the ownership of which Alex caused to be attributed to his sons when, in fact, it was transferred to K Enterprises. The referee held John and Louise are entitled to an accounting for distributions made to shareholders in 1988 and thereafter, and for payments to Marica shareholders in 1986 and thereafter, and for any payments in connection with the note signed by Michael and Alex III. To the extent

## ISSUES

1. Did the Court of Appeals apply the correct standard of review to the referee's findings of fraud?

2. Did the Court of Appeals properly affirm the referee's finding that 21% of the Marica stock had been transferred to K Enterprises?

3. Did the referee properly find Atlas had engaged in oppressive behavior under the South Carolina judicial dissolution statute?

## LAW/ANALYSIS

### 1. STANDARD OF REVIEW / FINDINGS OF FRAUD

Atlas contends the Court of Appeals applied an improper standard of review to the referee's findings of fraud. We disagree.

An appellate court's scope of review in cases of fraud, where the proof must be by clear, cogent and convincing evidence, is limited to determining whether there is any evidence reasonably supporting the circuit court's findings. *Burns v. Wannamaker*, 286 S.C. 336, 333 S.E.2d 358 (Ct.App. 1985) *aff'd as modified* 288 S.C. 398, 343 S.E.2d 27 (1986). *See also Townes Associates, Ltd. v. City of Greenville*, 266 S.C. 81, 221 S.E.2d 773 (1976) (in an action at law tried without a jury, the findings of fact of the judge will not be disturbed unless found to be without evidence which reasonably supports them). *Cf. Cook v. Metropolitan Life Insurance Co.*, 186 S.C. 77, 194 S.E. 636 (1938) (in law action for fraud and deceit, the question of fraud was for the trier of fact if more than one reasonable inference could be drawn from the evidence). It is not for the appellate court to weigh the evidence to determine whether it is sufficient to meet the burden of proof. 5A C.J.S. *Appeal & Error* § 1656(2) n. 71 at 447 (1958). *See Southeastern PVC Pipe, Mfg. v. Rothrock Construction Co.*, 280 S.C. 498, 313 S.E.2d 50 (Ct.App.1984).

Alex challenges the sufficiency of the evidence that he committed fraud regarding the transfer of the 21% of Marica

---

the Court of Appeals' opinion may be read as ordering a broader accounting than that ordered by the referee, its opinion is modified.

stock, Louise's ownership of 271 shares of Atlas stock, and the handling of Louise's 1990 distribution.

Contrary to Alex' contention, it is not the province of this Court to re-weigh the evidence to determine whether it is clear, cogent and convincing but, rather, we must determine whether there is evidence supporting the lower court's findings. We find evidentiary support in the record for each of the referee's findings of fraud. *Townes Associates, Ltd. v. City of Greenville, supra; Burns v. Wannamaker, supra.* Accordingly, the referee's findings of fraud are affirmed.[13]

## 2. TRANSFER OF MARICA STOCK

■ Atlas contends the referee erred in finding 21% of Marica[14] stock was transferred to K Enterprises; it claims John and Louise have no standing to challenge the transfer, and the referee had no jurisdiction to find the stock was transferred as K Enterprises is not a party to the action. We disagree.

Citing *Todd v. Zaldo,* 304 S.C. 275, 403 S.E.2d 666 (Ct.App. 1991), Atlas contends John and Louise have no standing as a cause of action for recovery of corporate assets belongs to the corporation, not the individual shareholders. As noted by the Court of Appeals, however, K Enterprises is a partnership, not a corporation, such that *Todd v. Zaldo* is inapplicable.[15]

---

13. For a more detailed analysis of the fraud issues, the reader is referred to the Court of Appeals' opinion at 338 S.C. at 585–591, 527 S.E.2d at 376–81. We concur with the Court of Appeals' treatment of the fraud issues.

14. In 1986, Atlas changed from a subchapter C corporation to a subchapter S corporation, necessitating a transfer, for tax purposes, of 21% of its ownership of Marica. At trial, Atlas' records attributed this 21% ownership change as going to Alex III and Michael. John and Louise contended they neither consented to nor had knowledge of this transfer. The referee found that Alex had fraudulently caused the 21% to be attributed to Alex III and Michael when, in fact, it had been transferred to K Enterprises.

15. Moreover, even if *Todd* were applicable, John and Louise have standing to assert the loss of their personal percentage of partnership assets in K Enterprises as a result of the stock being attributed to Alex III and Michael. *Todd* (individual stockholder may bring an action for loss of his personal assets).

We find John and Louise clearly have standing to contest the improper attribution of the 21% stock to Alex III and Michael.

[] Atlas also asserts the referee was without jurisdiction to make a finding regarding the ownership of K Enterprises because a) Alex III and Michael were necessary parties, and b) K Enterprises may not legally hold stock under the terms of the partnership agreement. We disagree.

Alex III and Michael were not necessary parties because John and Louise did not seek any remedy against them; they merely sought damages from Atlas and Alex for the fraudulent transfer of the shares. Moreover, Alex III and Michael were originally parties but were dismissed by consent of all parties. *See* Rule 12(h)(2), SCRCP (defense of failure to join indispensable parties is waived if not raised at trial). Finally, Atlas' claim that K Enterprises may not legally hold. stock is without merit. Contrary to Atlas' contention, nothing in the partnership agreement prohibits K Enterprises from holding stock; it specifically permits that the partnership may undertake any additional activities as decided by a majority interest.

Accordingly, the referee properly found the 21% of Marica stock, which was being improperly attributed to Alex' children, was actually transferred to K Enterprises.

## 3. BUYOUT DUE TO OPPRESSIVE CONDUCT

### a. Oppression Under S.C.Code Ann. § 33–14–300

The referee found that, taken together, the majority's actions were "illegal, fraudulent, oppressive or unfairly prejudicial," justifying a buyout of John and Louise's interests under S.C.Code Ann. § 33–14–300(2)(ii) and § 33–14–310(d)(4).[16] Accordingly, the referee held a buyout was in order under S.C.Code Ann. § 33–14–300(2)(ii) and 33–14–310(d)4).

---

**16.** Section 33–14–300(2)(ii) permits a court to order dissolution if it is established by a shareholder that "the directors or those in control of the corporation have acted, are acting, or will act in a manner that is illegal, fraudulent, oppressive, or unfairly prejudicial either to the corporation or to any shareholder (whether in his capacity as a shareholder, director, or officer of the corporation)." Section § 33–14–310(d)(4) permits a court to make such order or grant such relief, other than dissolution, as in its discretion is appropriate, including providing for the purchase at their fair value of shares of any shareholder, either by the corporation or by other shareholders.

The Court of Appeals affirmed the referee's holdings. In making this ruling, the Court of Appeals defined the statutory terms "oppressive" and "unfairly prejudicial" as follows:

1) A visible departure from the standards of fair dealing and a violation of fair play on which every shareholder who entrusts his money to a company is entitled to rely; or

2) A breach of the fiduciary duty of good faith and fair dealing; or

3) Whether the reasonable expectations of the minority shareholders have been frustrated by the actions of the majority; or

4) A lack of probity and fair dealing in the affairs of a company to the prejudice of some of its members; or

5) A deprivation by majority shareholders of participation in management by minority shareholders.

Atlas contends the Court of Appeals' definitions of oppressive, unfairly prejudicial conduct are beyond the scope of our judicial dissolution statute. We agree. In our view, the Court of Appeals' broad view of oppression is contrary to the legislative intent and is an unwarranted expansion of section 33–14–300.

 South Carolina's judicial dissolution statute was amended in 1963 in recognition of the growing trend toward protecting minority shareholders from abuses by those in the majority. Section § 33–14–300(2)(ii) now permits a court to order dissolution if it is established by a shareholder that "the directors or those in control of the corporation have acted, are acting, or will act in a manner that is illegal, fraudulent, oppressive, or unfairly prejudicial either to the corporation or to any shareholder (whether in his capacity as a shareholder, director, or officer of the corporation)." [17] The official comment to section 33–14–300 provides:

---

17. Prior to 1963, dissolution could be based only upon illegal, fraudulent or oppressive conduct. In an attempt to afford minority shareholders greater protection, the legislature amended the statute in 1963 to include "unfairly prejudicial" conduct. See 1963 S.C. Acts 282 § 89; S.C.Code § 12–22.15(a)(4)(1970). The statute, as amended, "broadens the scope of actionable conduct by providing the frozen-out minority shareholder a right of action based on conduct by the majority shareholders which might not rise to the level of fraud." Joshua Henderson,

The application of these grounds for dissolution to specific circumstances obviously involves judicial discretion in the application of a general standard to concrete circumstances. The court should be cautious in the application of these grounds so as to limit them to genuine abuse rather than instances of acceptable tactics in a power struggle for control of a corporation.

Section 33–14–300 cmt. 2(b). Although the terms "oppressive" and "unfairly prejudicial" are not defined in section 33–14–300, the comment to S.C.Code Ann. § 33–18–400 (1990), which allows shareholders in a statutory close corporation to petition for relief on the grounds of oppressive, fraudulent, or unfairly prejudicial conduct provides:

No attempt has been made to define oppression, fraud, or unfairly

prejudicial conduct. These are elastic terms whose meaning varies with the circumstances presented in a particular case, and it is felt that existing case law provides sufficient guidelines for courts and litigants.[18]

---

*Buyout Remedy for Oppressed Minority Shareholders*, 47 S.C. L.Rev. 195, 199 (Autumn 1995) (hereinafter Henderson). This trend arose due to the nationwide epidemic of unfair treatment of minority shareholders. *See* Harry J. Haynsworth, *The Effectiveness of Involuntary Dissolution Suits as a Remedy for Close Corporation Dissension*, 35 Clev. St. L.Rev. 25 (1986–87); F.H. O'Neal, *Oppression of Minority Stockholders: Protecting Minority Rights*, 35 Clev. St. L.Rev. 121 (1986–87). In the latter article, Prof. O'Neal observed:

Unfair treatment of holders of minority interests in family companies and other closely held corporations by persons in control of those corporations is so widespread that it is a national business scandal. The amount of litigation growing out of minority shareholder oppression—actual, fancied or fabricated—has grown tremendously in recent years, and the flood of litigation shows no sign of abating. *Id.* at 121, 403 S.E.2d 666.

**18.** The courts of this state have only peripherally addressed the meaning of "oppressive" or "unfairly prejudicial" conduct. In one of the earliest cases, *Towles v. S.C. Produce Ass'n*, 187 S.C. 290, 197 S.E. 305 (1908), the Court found the failure to pay dividends for three years did not warrant dissolution under the statute since the lack of dividends had been in an attempt to rehabilitate a weak financial corporation. The *Towles* court noted, however, "this statute was intended to afford minority stockholders a method of relief against mismanagement of a corporation by majority stockholders, or the suspension of dividends for the purpose of freezing out minority stockholders, or depressing the

Given the Legislature's deliberate exclusion of a set definition of oppressive and unfairly prejudicial conduct, we find the Court of Appeals' enunciation of rigid tests is contrary to the legislative intent.

■ Under the Court of Appeals' holding, a finding of fraudulent/oppressive conduct may be based upon any **one** of its alternative definitions. We do not believe the Legislature intended such a result. In particular, we do not believe the Legislature intended a court to judicially order a corporate dissolution **solely** upon the basis that a party's "reasonable expectations" have been frustrated by majority shareholders. To examine the "reasonable expectations" of minority shareholders would require the courts of this state to microscopically examine the dealings of closely held family corporations, the intentions of majority and minority stockholders in forming the corporation and thereafter, the history of family dealings, and the like. We do not believe the Legislature, in enacting section 33–14–300, intended such judicial interference in the business philosophies and day to day operating practices of family businesses.

In adopting the "reasonable expectations" approach, the Court of Appeals cited the North Carolina case of *Meiselman v. Meiselman*, 309 N.C. 279, 307 S.E.2d 551 (1983).[19] In *Meiselman*, a minority shareholder in a family-owned close corporation was "frozen out" of the family corporation in much

market value of the stock of the corporation ..." 187 S.C. at 295, 197 S.E. at 307. In *Segall v. Shore*, 269 S.C. 31, 236 S.E.2d 316 (1977), the defendants had misappropriated over $1,000,000 of corporate profits in spite of an earlier opinion of this Court directing them to restore profits and account. The master found, and this Court upheld, that the defendants had acted oppressively and unfairly. In *Roper v. Dynamique Concepts, Inc.*, 316 S.C. 131, 447 S.E.2d 218 (Ct.App.1994), the Court of Appeals held the issuance of additional shares of stock as a last ditch effort to raise capital for a financially troubled corporation was sufficient to overcome a claim of oppression, since the shares had been issued in good faith.

19. *Meiselman* has been referred to as a "leading case" in adoption of this approach. *See* Dean F. Hodge O'Neal, *O'Neal's Close Corporations*, § 9.30 at 144 (3d Ed.1991) (hereinafter O'Neal); *see also* Robert S. McLean, *Minority Shareholders' Rights in the Close Corporation Under New North Carolina Business Corporation Act*, 68 N.C. L.Rev. 1109, 1114 (1989).

the same fashion as John and Louise claim they have been frozen out of Atlas. The minority shareholder brought an action requesting a buyout of his interests under N.C.G.S. § 55–125.1(a)(4), which permits a North Carolina court to liquidate assets when it is **"reasonably necessary for the protection of the rights or interests of the complaining shareholders."** (Emphasis supplied).

In holding the minority shareholder was entitled to relief, the *Meiselman* court noted that the trial court had focused on the conduct of the majority shareholder, using standards of "oppression," "overreaching," "unfair advantage," and the like. 307 S.E.2d at 567. The Court found this was error because the North Carolina statute in question required the trial court to focus on the plaintiff's "rights and interests" his "reasonable expectations" in the corporate defendants, and determine whether those rights or interests were in need of protection. *Id.*[20] The focus in *Meiselman,* based upon the language of the North Carolina statute, was upon the **interests** of the minority shareholder, as opposed to the **conduct** of the majority.

Unlike the North Carolina statute in *Meiselman,* section 33–14–300 does not place the focus upon the "rights or interests" of the complaining shareholder but, rather, specifically places the focus upon the **actions** of the majority, i.e., whether they "have acted, are acting, or will act in a manner that is illegal, fraudulent, oppressive, or unfairly prejudicial either to the corporation or to any shareholder." Given the language of our statute, a "reasonable expectations" approach is simply inconsistent with our statute.

We recognize that a number of leading authorities, such as Dean Haynsworth, advocate a "reasonable expectations" approach to oppressive conduct:

---

**20.** As in North Carolina, California also places the emphasis on the interests of the minority, as opposed to the actions of the majority. *See* Cal. Corp.Code § 1800 (*cited* in O'Neal, *supra,* § 9.29 at 131, n. 8). *See also Matter of Kemp & Beatley, Inc.,* 64 N.Y.2d 63, 484 N.Y.S.2d 799, 473 N.E.2d 1173 (1984) (interpreting McKinney's Business Corporation Law § 1104–a which allows court to liquidate assets if a) it is the only feasible means whereby the petitioners may reasonably expect to obtain a fair return on their investment or b) it is reasonably necessary to protect rights and interests of shareholders).

The third definition of oppression, initially derived from English case law and long advocated by close corporation experts like Dean F. Hodge O'Neal, is **conduct which frustrates the reasonable expectations of the investors....** It has gained widespread acceptance in recent years, particularly in cases involving close corporations where all the shareholders expect to be employed by the corporation and to be actively involved in its management and one of the shareholders is fired and then 'frozen out' from any compensation or participation in management.

Harry J. Haynsworth, *Special Problems of Closely Held Corporations,* C688 ALI–ABA 1, 53 (1991)(emphasis supplied; internal citations omitted).

Although several jurisdictions have adopted "reasonable expectations" as a guide to the meaning of "oppression," [21] it has been noted by one commentator that "no court has adopted the reasonable expectations test without the assistance of a statute." Ralph A. Peeples, *The Use and Misuse of the Business Judgment Rule in the Close Corporation,* 60 Notre Dame L.Rev. 456, 505 (1985) (hereinafter Peeples).[22] One criticism of the "reasonable expectations" approach is that it "ignores the expectations of the parties other than the dissatisfied shareholder." *See Lerner v. Lerner Corp.,* 132 Md.App. 32, 750 A.2d 709, 722 (Md.2000) (*citing* Robert W. Hillman, *The Dissatisfied Participant in the Solvent Business Venture: A Consideration of the Relevant Permanence of Partnerships and Close Corporations.,* 67 Minn. L.Rev. 1, 75–78 (1982)). One recent commentator has suggested that a pure "reasonable expectations" approach overprotects the minority's interests. Douglas K. Moll, *Shareholder Oppression in Close Corporations: The Unanswered Question of Perspective,* 53 Vand. L.Rev. 749, 826 (April 2000)(hereinafter Moll).

---

**21.** *See* O'Neal, *supra* at § 9.30, pp. 142–143, *citing Stefano v. Coppock,* 705 P.2d 443, 446 (Alaska 1985); *Fox v. 7L Bar Ranch Co.,* 198 Mont. 201, 645 P.2d 929 (1982); *Balvik v. Sylvester,* 411 N.W.2d 383 (N.D. 1987); *Masinter v. WEBCO,* 164 W.Va. 241, 262 S.E.2d 433, 442 (1980).

**22.** Peeples notes, "[t]he most unique feature of the reasonable expectations analysis is the lack of a bad faith requirement. At most, the plaintiff is required to show that he or she was not at fault, not that the defendant acted in bad faith." 60 Notre Dame L.Rev. at 504.

Similarly, it has been suggested that the reasonable expectations approach is "based on false premises, invites fraud, and is an unnecessary invasion of the rights of the majority." J.C. Bruno, *Reasonable Expectations:A Primer on An Oppressive Standard*, 71 Mich. B.J. 434 (May 1992).[23] *See also* Sandra K. Miller, *How Should U.K. and U.S. Minority Shareholder Remedies for Unfairly Prejudicial or Oppressive Conduct Be Reformed?*, 36 Am. Bus. L.J. 579, 632 (Summer 1999)(suggesting the "vague and uncertain reasonable expectation test undermines the institution of stare decisis and fails to foster judicial accountability.").

█ We find adoption of the "reasonable expectations" standard is inconsistent with section 33–14–300, which places an emphasis not upon the minority's expectations but, rather, on the actions of the majority. We decline to adopt such an expansive approach to oppressive conduct in the absence of a legislative mandate.[24] We find, consistent with the Legislature's comment to section 33–18–400, that the terms "oppressive" and "unfairly prejudicial" are elastic terms whose meaning varies with the circumstances presented in a particular case. As noted by one commentator:

> While business corporation statutes may attempt to provide certainty and clarity in the law to enhance the attractiveness of doing business, the definition of oppression has been left to judicial construction on a case-by-case basis. Such an approach has been suggested by the Model Close Corporation Supplement which expressly indicates that no attempt has been made to statutorily define oppression, fraud or prejudicial conduct, leaving these "elastic terms" to judicial interpretation.... The judicial construction of the

---

23. Bruno theorizes that adoption of the reasonable expectations standard 1) will create instability and uncertainty in the field of corporate law: 2) increase litigation as every minority shareholder will assert reasonable expectations were frustrated, 3) discourage majority or wholly owned corporations from raising capital through offerings to minority interests,and 4) is unnecessary as present safeguards are adequate. *Id.*

24. If the legislature wishes to afford such expansive rights to minority shareholders, it may amend the statute to include language similar to the statutes in North Carolina, California, and New York. *Accord Steinke v. SC Dep't of Labor*, 336 S.C. 373, 520 S.E.2d 142 (1999).

definition of oppressive conduct is well-suited to the diversified, fact-specific disputes among shareholders of closely-held corporations. However, the judicial development of a meaningful standard for defining oppressive conduct, apart from fraud or mismanagement, is a difficult task.

Sandra K. Miller, *Should the Definition of Oppressive Conduct by the Majority Shareholders Exclude a Consideration of Ethical Conduct And Business Purpose*, 97 Dick. L.Rev. 227, 229–230 (Winter 1993). We find a case-by-case analysis, supplemented by various factors which may be indicative of oppressive behavior, to be the proper inquiry under S.C.Code § 33–14–300.[25] Accordingly, the Court of Appeals' opinion is modified to the extent it adopted a "reasonable expectations" approach.

### b. Oppression Under Circumstances of This Case

 The question remains whether the conduct of Atlas toward John and Louise was "oppressive" and "unfairly prejudicial" under the factual circumstances presented. We find this case presents a classic example of a majority "freeze-out," and that the referee properly found Atlas had engaged in conduct which was fraudulent, oppressive and unfairly prejudicial. Accordingly, the referee properly ordered a buyout of their shares pursuant to S.C.Code Ann. § 33–14–310(d)(4).

 The particular problems encountered by those in the close corporation setting was noted in *Meiselman*, 307 S.E.2d at 559 (citing J.A.C. Hetherington, *Special Characteristics, Problems, and Needs of the Close Corporation*, 1969 U.Ill.L.F. 1, 21 (1969)):

---

**25.** We agree with Professor Miller's suggestion that the best approach to the statutory definition of oppressive conduct may well be a case-by-case analysis, augmented by factors or typical patterns of majority conduct which tend to be indicative of oppression, such as exclusion from management, withholding of dividends, paying excessive salaries to majority shareholders, and analogous activities. Sandra K. Miller, *How Should U.K. and U.S. Minority Shareholder Remedies for Unfairly Prejudicial or Oppressive Conduct Be Reformed?*, 36 Am. Bus. L.J. 579, 585–586 (Summer 1999). In this regard, we note that we do not hold that a court may never consider the parties' reasonable expectations, or the other items enumerated by the Court of Appeals, as **factors** in assessing oppressive conduct; such factors, however, are not to be utilized as the sole test of oppression under South Carolina law.

■■■■■■■■■■■■■■■■■■■■■ .
■■■■■■■ )

The right of the majority to control the enterprise achieves a meaning and has an impact in close corporations that it has in no other major form of business organization under our law. Only in the close corporation does the power to manage carry with it the de facto power to allocate the benefits of ownership arbitrarily among the shareholders and to discriminate against a minority whose investment is imprisoned in the enterprise. The essential basis of this power in the close corporation is the inability of those so excluded from the benefits of proprietorship to withdraw their investment at will.

This unequal balance of power often leads to a "squeeze out" or "freeze out" [26] of the minority by the majority shareholders. *See* F. Hodge O'Neal, *Oppression of Minority Shareholders: Protecting Minority Rights,* 35 Clev. St. L.Rev. 121, 125 (1986/1987) (hereinafter O'Neal's *Oppression* ); Anthony and Borass, *Betrayed, Belittled ... But Triumphant: Claims of Shareholders in Closely Held Corporations,* 22 Wm. Mitchell L.Rev. 1173, 1175 (1996). In the close corporation, a shareholder

[F]aces a potential danger the shareholder of a public corporation generally avoids—the possibility of harm to the fair value of the shareholder's investment. At its extreme, this harm manifests itself as the classic freeze out where the minority shareholder faces a trapped investment and an indefinite exclusion form participation in business returns. The position of the close corporation shareholder, therefore, is uniquely precarious.

Moll, 53 Vand. L.Rev. at 790–91. Common freeze out techniques include the termination of a minority shareholder's employment, the refusal to declare dividends,[27] the removal of

---

**26.** "Freeze out" is often used as a synonym for "squeeze out." The term squeeze out means the use by some of the owners or participants in a business enterprise of strategic position, inside information, or powers of control, or the utilization of some legal device or technique, to eliminate from the enterprise one or more of its owners or participants. 2 F. Hodge O'Neal & Robert B. Thompson, *O'Neal's Oppression of Minority Shareholders,* § 1.01 at 1 (2d ed.1999).

**27.** Majority freeze out schemes which withhold dividends "are designed to compel the minority to relinquish stock at inadequate prices. When the minority stockholder agrees to sell out at less than fair value, the

a minority shareholder from a position of management, and the siphoning off of corporate earnings through high compensation to the majority shareholder. Often, these tactics are used in combination.[28] Moll, 53 Vand. L.Rev. at 757–758. In a public corporation, the minority shareholder can escape such abuses by selling his shares; there is no such market, however, for the stock of a close corporation. *Id.*[29] "The primary vulnerability of a minority shareholder is the specter of being 'locked in,' that is, having a perpetual investment in an entity without any expectation of ever receiving a return on that investment." Charles Murdock, *The Evolution of Effective Remedies for Minority Shareholders and Its Impact Upon Valuation of Minority Shares*, 65 Notre Dame L.Rev. 425, 477 (1990).

■ The present case presents a classic situation of minority "freeze out." The referee considered the following factors: 1) Alex' unilateral action to deprive Louise of the benefits of ownership in her shares in Atlas, and subsequent reduction in her distributions based upon the reduced number of shares,[30]

---

majority has won." *Donahue v. Rodd Electrotype Co.*, 367 Mass. 578, 328 N.E.2d 505, 515 (1975)(internal citations omitted). *See also* Robert B. Thompson, *The Shareholder's Cause of Action for Oppression*, 48 Bus. Law, 699, 703–4 (1993) (noting that in a classic "freeze out," the majority first denies the minority any return and then proposes to buy the shares at a very low price).

28. A host of factors is identified in 1 F. Hodge O'Neal and Robert B. Thompson, *O'Neal's Oppression of Minority Shareholders*, Chap. 3 (2d ed.1999), including, but not limited to, dividend withholding, eliminating minority shareholders from directorate and excluding them from employment, siphoning off corporate earnings via high compensation, leases and loans favorable to majority shareholders, failure to enforce contracts for the benefit of the corporation, appropriation or corporate assets, contracts or credit for personal use, usurping corporate opportunities, transactions between a parent corporation and a subsidiary, withholding information from minority shareholders.

29. Effectively, the minority shareholder's capital investment is "held hostage by those in control of the corporation because there is no marketplace in which the minority may sell their shares." Sandra. L. Schlafge, *Comment, Pedro v. Pedro: Consequences for Closely Held Corporations and the At–Will Doctrine in Minnesota*, 76 Minn. L.Rev. 1071, 1076 (1992).

30. As detailed more fully in the Court of Appeals' opinion, Atlas made a 1990 distribution to Louise based upon her ownership of 271 shares of

2) Alex' conduct in depriving John and Louise of the 21% interest of Marica stock, 3) the fact that there is no prospect of John and Louise receiving any financial benefit from their ownership of Atlas shares,[31] 4) the fact that Alex and his family continue to receive substantial benefit from their ownership in Atlas, 5) the fact that Atlas has substantial cash and liquid assets, very little debt and that, notwithstanding its ability to declare dividends, it has indicated it would not do so in the foreseeable future, 6) the fact that Alex, majority shareholder in total control of Atlas, is totally estranged from John and Louise, 7) Atlas' extremely low buyout offers to John and Louise, and 8) the fact that Atlas is not appropriate for a public stock offering at the present time.[32]

These factors, when coupled with the referee's findings of fraud, present a textbook example of a "freeze out" situation. Short of a buyout of their shares, it is unlikely John and Louise will ever receive any benefit from their ownership interests in Atlas. We find the referee properly concluded the totality of the circumstances demonstrated that the majority had acted "oppressively" and "unfairly prejudicially" to John

---

Atlas stock when the referee found Louise, in fact, owns 301 shares of stock.

**31.** The referee considered a number of factors in determining they would receive no financial benefit including salary, retirement benefits, John's lack of status as President, the fact that John would no longer receive loans from the company since he lost his employment, the loss of fringe benefits, the fact that John and Louise were paying their own attorney's fees, and the fact that a sale of Atlas was not contemplated. The referee then weighed these factors against the benefits still received by Alex and his family.

**32.** The referee ruled Atlas could not rely upon the "Business Judgment Rule" to justify its treatment of John and Louise. The Business Judgment Rule immunizes management from liability in corporate transactions undertaken by management where there is a reasonable basis to indicate the transaction was made in good faith. BLACK'S LAW DICTIONARY 181 (5 th Ed.1979). *See Goddard v. Fairways Dev. Gen. Partnership*, 310 S.C. 408, 426 S.E.2d 828 (Ct.App.1993)(in dispute between directors of homeowners association and aggrieved homeowners, conduct of directors should be judged by business judgment rule, and absent showing of bad faith, dishonesty, or incompetence, judgment of directors will not be set aside by judicial action). Given the ample evidence demonstrating a lack of good faith in this case, we find the Business Judgment Rule has no application here.

and Louise. Accordingly, we affirm the referee's finding that a buyout of John and Louise's shares is the appropriate remedy under the circumstances of this case.

We are constrained to note that this case cries out for settlement between the parties. In fact, both parties conceded both in brief and at oral argument before this Court that a buyout is in order; it is at this point simply a matter of price. It is patent from the record before us that Atlas has an abundance of cash and liquid assets which would permit a buyout. Given the parties' ages and the need for a resolution of this matter, we simply cannot fathom why an amicable settlement cannot be reached between the parties.

## CONCLUSION ·

Under South Carolina's judicial dissolution statute, the Court of Appeals erred in attempting to define oppressive and unfairly prejudicial conduct. Further, we reject the "reasonable expectations" approach adopted by the Court of Appeals. Under section 33–14–300, the proper focus is not on the reasonable expectations of the minority but, rather, on the conduct of the majority. Such an inquiry is to be performed on a case-by-case basis, with an inquiry of all the circumstances and an examination of the many factors hereinabove recited. We believe such an inquiry is in keeping with the Legislature's intention in enacting sections 33–14–300 and 33–14–310.

Under the factual circumstances presented here, we find the majority's conduct clearly constitutes oppressive and unfairly prejudicial conduct entitling John and Louise to a buyout of their shares. Accordingly, the Court of Appeals' opinion is affirmed in result as modified and the case remanded to the referee to determine a valuation of the John and Louise's shares, and to ascertain any damages suffered as a result of Alex' fraud.[33]

---

**33.** Atlas asserts the Court of Appeals erred in dismissing its counterclaim for the $133,932 negative balance in John's MEL account. In brief, John concedes the negative balance "is, indeed, on the books and may be rightly taken into account in future valuation proceedings." Accordingly, as John concedes the debt is owed there is nothing for this

**AFFIRMED IN RESULT AS MODIFIED AND RE-MANDED.**

MOORE, BURNETT, JJ., and Acting Justices Henry F. Floyd and George T. Gregory, Jr., concur.

Court to review. The referee may consider this fact during the valuation proceeding.